The **MAINE CENTRAL RAILROAD COMPANY** and the **Portland Terminal Company, Plaintiffs, Appellants,**

v.

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, Defendant, Appellee.**

No. 86–1875.

United States Court of Appeals, First Circuit.

Argued Jan. 5, 1987.

Decided March 10, 1987.

As Amended March 12, 1987.

John Spelman with whom Andrew O. Schiff and Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa., were on brief for plaintiffs/appellants.

Richard S. Edelman with whom John O'B. Clarke, Jr. and Highsaw & Mahoney, P.C., Washington, D.C., were on brief for defendant/appellee.

Jeffrey Clair, Dept. of Justice, with whom William Kanter, Dept. of Justice, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., and Richard S. Cohen, U.S. Atty., Portland Me., were on brief for United States, amicus curiae.

Before BOWNES, Circuit Judge, ROSENN,* Senior Circuit Judge, and SELYA, Circuit Judge.

BOWNES, Circuit Judge.

Plaintiffs-appellants Maine Central Railroad Company and the Portland Terminal Company (collectively, Maine Central) brought an action in district court challenging the constitutionality of an Act of Congress. The challenged legislation imposed a moratorium on changes in the conditions of Maine Central's employment relationship with defendant-appellee, the Brotherhood of Maintenance of Way Employees (BMWE). The district court denied Maine Central's motion for a temporary restraining order and preliminary injunction, granted BMWE's motion for summary judgment, and dismissed the complaint. We hold that the Act was constitutional and affirm the district court.

## I. BACKGROUND

Maine Central operates about 740 miles of trackage. Its lines are principally in Maine, but they extend into New Hampshire and Vermont. BMWE, a national labor organization, is the bargaining representative for Maine Central's maintenance of way employees, who perform such labor as track laying and surfacing work, roadway maintenance, and building and structural work. In April 1984 the two parties began negotiating changes BMWE had requested in the existing collective bargaining agreements. The focus of the dispute was job protection. There had been as many as 390 maintenance of way employees working on a seasonal and special project basis at Maine Central in July 1982; there are now approximately sixty-five in active service.

On March 3, 1986, BMWE called a strike. In April 1986 the strike action was extended to include secondary picketing of other railroads.[1] The National Mediation Board, whose services had been requested by BMWE initially in September 1984, determined that the Maine Central-BMWE dispute threatened to interrupt commerce and to deprive the country of essential transportation services. Based on this determination a Presidential Emergency Board was appointed on May 16, 1986, to investigate the matter and to prepare a report. Exec. Order No. 12,557, 51 Fed.Reg. 18,429

---

* Of the Third Circuit, sitting by designation.

1. See Brotherhood of Maintenance of Way Employees v. Guilford Transp. Indus., Inc., 803 F.2d 1228 (1st Cir.1986), in which this court held secondary picketing resulting from the Maine Central-BMWE dispute to be lawful.

(1986); *see* 45 U.S.C. § 160 (1982). Section 160 of the Railway Labor Act, which authorizes the appointment of a Presidential Emergency Board, prohibits the parties to the dispute from changing "the conditions out of which the dispute arose," except by agreement, until thirty days after the Board has made its report to the President. 45 U.S.C. § 160. That report was made on June 20, 1986, and Maine Central rejected the settlement recommended in it.

The statutory cooling-off period imposed by section 160 expired on July 20, 1986. On August 6, 1986, Maine Central unilaterally instituted new work rules and rates of pay, which included a twenty percent reduction in wages. BMWE was unsuccessful in an action in district court seeking injunctive relief to restrain Maine Central from implementing the changes.

On August 12, 1986, Congress enacted a "Joint Resolution to provide for a temporary prohibition of strikes or lockouts with respect to the Maine Central Railroad Company and Portland Terminal Company labor-management dispute." Act of Aug. 21, 1986, Pub.L. No. 99–385, 100 Stat. 819. This legislation (the Act) was approved by the President on August 21, 1986. It directed that an advisory board be appointed to make findings and recommendations on the dispute. The cooling-off period that had expired on July 20 was extended for sixty days from July 21; the parties were forbidden from changing, except by agreement, "the conditions out of which [the] dispute arose as such conditions existed before ... March 3, 1986." 100 Stat. at 819. The Act, therefore, required Maine Central to pay its BMWE employees at pre-March 3 rates, thereby invalidating the changes instituted in August. Maine Central apparently did reinstate the wages to their pre-March 3 rates during the Act's effective period.

On August 22, 1986, Maine Central filed a complaint in district court for injunctive and declaratory relief, requesting that the Act be declared unconstitutional and that its enforcement be enjoined. The United States, as amicus curiae, filed a statement of interest and memorandum in support of the Act. Maine Central asked to be allowed to pay into the court the difference between the pre-March 3 wage rates and the wage rates it had instituted in August, so that it would not have to recover these sums from the individual employees if its constitutional challenge proved successful. This request was denied. At a hearing on September 10, 1986, the district court denied Maine Central's request for a temporary restraining order and a preliminary injunction, and on September 17, 1986, it granted BMWE's motion for summary judgment and dismissed Maine Central's complaint. The next day, on September 18, 1986, the same day the cooling-off period imposed by the Act expired, Maine Central filed notice of this appeal.[2]

## II. MOOTNESS

■ We first decide the preliminary question of whether Maine Central's appeal became moot when the cooling-off period imposed by the Act expired. Federal jurisdiction under article III is limited to actual cases and controversies. *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 546, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976). "Simply stated, a case is moot when the issues are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969). According to BMWE, because the cooling-off period has expired, "there is no longer a live controversy concerning the possibility that BMWE might seek to enforce the statute," and Maine Central "has no legally cognizable interest in the outcome of its challenge to the constitutionality of that legislation." We do not agree. Although the cooling-off period imposed by the Act has expired, there still are cognizable interests at stake in this appeal.

---

**2.** Congress subsequently made the report and recommendations of the Presidential Emergency Board binding on the parties, subject to modification by mutual agreement. Act of Sept. 30, 1986, Pub.L. No. 99–431, 100 Stat. 987. That legislation is the subject of a separate action and is not at issue here.

The Act required the parties to reinstate pre-March 3, 1986, working conditions retroactively to July 21, 1986, the day after the expiration of the cooling-off period that was imposed because of the appointment of the Presidential Emergency Board. Maine Central reduced its maintenance of way employees' wages by twenty percent on August 6, 1986, and continued to pay them at that rate until the Act became effective on August 21, 1986. BMWE has brought a suit in district court to recover wages owed under the Act for that period. Maine Central asked the district court to defer its decision in that suit until we issued an opinion in this appeal, and to our knowledge that case is still pending. If we were to hold the Act to be unconstitutional, as urged by Maine Central, that claim to back wages would necessarily fail.

We cannot dismiss a case as moot if there are live issues, even if they are secondary or incidental, because there still is a case or controversy to be decided. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 571, 104 S.Ct. 2576, 2584, 81 L.Ed.2d 483 (1984) (challenge to preliminary injunction requiring employees to be reinstated not moot, even though the employees had been restored to their former positions, because, among other things, there were unresolved back pay and seniority issues); *Powell v. McCormack*, 395 U.S. at 495–500, 89 S.Ct. at 1950–52 (constitutional challenge to exclusion from the Ninetieth Congress was held not to be moot, even though that session of Congress had terminated and petitioner had been seated in the Ninety-first Congress, because his claim for back salary was "still unresolved and hotly contested by clearly adverse parties").[3] The back pay issue here is very much alive, and this appeal is not moot.[4]

## III. CONSTITUTIONALITY

Maine Central argues that the Act is unconstitutional for two reasons. First, it violated the equal protection component of the fifth amendment[5] by singling out Maine Central for burdensome treatment. Second, it violated the separation of powers doctrine by legislatively adjudicating the rights of Maine Central and BMWE. We consider each argument in turn.

### A. Equal Protection

The Supreme Court long ago made it clear that the operation of interstate railroads has a public aspect justifying the exercise of federal legislative power to keep labor disputes from interrupting interstate commerce. *See Wilson v. New*, 243 U.S. 332, 347–48, 37 S.Ct. 298, 301, 61 L.Ed. 755 (1917). Congress acted pursuant to this authority when, in the Railway Labor Act of 1926, it established a compulsory railroad labor dispute resolution process. *Detroit & T.S.L.R.R. v. United Transp. Union*, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969); *Virginian Ry. v. System Fed'n No. 40*, 300 U.S. 515, 553–54, 57 S.Ct. 592, 602–03, 81 L.Ed. 789 (1937); *see* 45 U.S.C. §§ 151–163.

The Railway Labor Act contains "rather elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation." *Detroit & T.S.L.R.R. v. United Transp. Union*, 396 U.S. at 148–49, 90 S.Ct. at 298. An important aspect of this

---

**3.** We do not address in this appeal whether or not Maine Central can constitutionally be required to pay any wages retroactively due under the Act. We leave the resolution of that controversy to the proceedings now pending in district court. There are no factual questions, however, that must be resolved before we can consider Maine Central's arguments that the Act violated the equal protection component of the fifth amendment and the separation of powers doctrine.

**4.** We consequently do not decide whether this case also is not moot because it is "capable of repetition, yet evading review" as contended by Maine Central. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

**5.** Of course, the equal protection clause is in the fourteenth amendment, which is applicable only to the states. The Supreme Court has instructed, however, that there is an equal protection component to the due process clause of the fifth amendment, which applies to congressional action, because "discrimination may be so unjustifiable as to be violative of due process." *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

machinery is the government's ability to prolong negotiation while not allowing chanqes in the status quo by means of self-help. There is "an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30–day 'cooling-off' period" that follows the report of the Presidential Emergency Board. *Id.* at 152, 90 S.Ct. at 300; *see* 45 U.S.C. §§ 155, 156, 160. The parties are required by these provisions to preserve and maintain the working conditions and practices that existed before the dispute arose. *Detroit & T.S.L. R.R. v. United Transp. Union,* 396 U.S. at 152, 90 S.Ct. at 300. The Supreme Court described the importance of this moratorium on changes in the employment relationship:

> The [Railway Labor] Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

*Id.* at 150, 90 S.Ct. at 299.

In the Maine Central-BMWE dispute, the usual procedures were not enough. The final cooling-off period had expired without a resolution, and soon afterward Maine Central lowered the wages of its maintenance of way employees, an action that could be expected to result in a renewed strike. Congress responded to this threat by extending the dispute resolution process for an additional sixty days. If Congress had the power to create the Railway Labor Act scheme, which it did, it also had the power to modify it. "It was for Congress to make the choice of the means by which its objective of securing the uninterrupted service of interstate railroads was to be secured...." *Virginian Ry. v. System Fed'n No. 40,* 300 U.S. at 553, 57 S.Ct. at 602. Maine Central argues, however, that although Congress may have the power to establish a process requiring participants in a railroad employment dispute to maintain the status quo, its right to equal protection of the laws was violated when its dispute was singled out by Congress for an additional cooling-off period.

The degree to which legislation is scrutinized for a denial of equal protection depends on the nature of the classification made in the statute. "Strict" scrutiny is only appropriate when the statute involves the inherently suspect classifications of race, national origin, or alienage, or it impinges on a fundamental personal right. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985). The Supreme Court has identified only two classifications that warrant "heightened" scrutiny: gender and legitimacy. *Id.* Economic legislation, like the Act, "that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose." *Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981); *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 174–79, 101 S.Ct. 453, 459–61, 66 L.Ed.2d 368 (1980).

■ Maine Central urges that this rational basis test, which is usually applied to economic legislation, is inappropriate "when the legislature selects a single person for adverse treatment."[6] According to

---

**6.** We note that the Act in reality affected more than a "single person." While it prevented Maine Central from unilaterally changing its employees' wages during the cooling-off period, it also kept the employees from exercising self-help of their own by going on strike. This latter preventive was, after all, the reason why this legislation was enacted; it addressed the threat

Maine Central, there is an underlying presumption in the deferential rational basis test that inequities will be resolved through the political process, but this presumption is invalid when only one individual is affected.

The unresponsiveness of the democratic process to legislative burdens inequitably placed on certain groups has no doubt played a role in the formulation of the degree to which legislative classifications will be scrutinzed. *See City of Cleburne v. Cleburne Living Center*, 105 S.Ct. at 3255 (one reason for strict scrutiny is because certain kinds of discrimination are "unlikely to be soon rectified by legislative means"). The focus, however, has not been on the number of individuals at whom the statute is aimed, but on the nature of the classification and whether it is likely to be relevant to a legitimate state purpose. *Id.* at 3254. To subject economic legislation, which the Court has said need only have a rational basis, to heightened scrutiny because its reach is particularized would diverge from the Supreme Court's equal protection analysis framework. Indeed, the Court has instructed that when economic legislation is at issue, we are to presume that "even improvident decisions will eventually be rectified by the democratic processes." *Id.*

Maine Central relies on three Supreme Court cases as authority for its contention that heightened scrutiny should be applied. *McFarland v. American Sugar Ref. Co.*, 241 U.S. 79, 36 S.Ct. 498, 60 L.Ed. 899 (1916); *Cotting v. Kansas City Stock Yards Co.*, 183 U.S. 79, 22 S.Ct. 30, 46 L.Ed. 92 (1901); *Atchison, T. & S.F. R.R. v. Matthews*, 174 U.S. 96, 19 S.Ct. 609, 43 L.Ed. 909 (1899). We do not find much support for Maine Central's position in

these cases. In *McFarland v. American Sugar Ref. Co.*, a sugar refinery successfully challenged a state statute imposing severe penalties on certain refineries. The problem with the classification was not that it affected only one company, but that it made that company presumptively guilty of a crime without "some rational connection between the fact proved and the ultimate fact presumed." 241 U.S. at 86, 36 S.Ct. at 501. (quoting *Mobile, J. & K.C. R.R. v. Turnipseed*, 219 U.S. 35, 43, 31 S.Ct. 136, 138, 55 L.Ed. 78 (1910)). In *Cotting v. Kansas City Stock Yards Co.*, the Court invalidated on equal protection grounds a state statute establishing a schedule of rates for stockyards. The statute in that case arbitrarily burdened only the Kansas City Stock Yards Company; it did not apply to other Kansas companies engaged in the same business, who could not be distinguished on a legitimate basis. 183 U.S. at 111–12, 22 S.Ct. at 43. In *Atchison T. & S.F. R.R. v. Matthews*, the Court sustained a state statute providing for a presumption of negligence on railroads in suits to recover for damages caused by fire. The Court warned "that the equal protection guaranteed by the Constitution forbids the legislature to select a person, natural or artificial, and impose upon him or it burdens and liabilities which are not cast upon others similarly situated." 174 U.S. at 104, 19 S.Ct. at 612. These cases do not support Maine Central's argument for heightened scrutiny. They demonstrate the vulnerability of legislation imposing a burden on a particular individual but not on others similarly situated. In the case now before us, Congress specifically found that Maine Central, by virtue of its labor problems, was uniquely situated.[7]

---

to interstate commerce. As we explain later in the opinion, however, even if economic legislation does affect only a single person, it still will be sustained if the classification was rationally related to a legitimate state interest.

**7.** Maine Central also states that the Supreme Court's review of tax valuation legislation, especially *Hillsborough v. Cromwell*, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946), demonstrates judicial hostility to legislation singling out one individual. Maine Central again overlooks the

critical point that in equal protection analysis, the Court's concern is with legislation affecting one individual when there are others similarly situated, and who cannot be distinguished on some legitimate, rational basis. In *Hillsborough*, the Court said that "[t]he equal protection clause of the Fourteenth Amendment protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." *Id.* at 623, 66 S.Ct. at 448. The Court in fact extends great deference to a legis-

**490**

The three cases on which Maine Central relies are from an era in which the Court gave little deference to legislative judgment in economic matters. They predate *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), and their progeny, in which the Court disclaimed any intent to scrutinize economic legislation for more than a rational basis. Even before the evolution of the rational basis test, however, the Court demonstrated that its concern was with legislation that arbitrarily singled out an individual for burdensome treatment. This point was made clear in *Fort Smith Light and Traction Co. v. Board of Improvement,* 274 U.S. 387, 47 S.Ct. 595, 71 L.Ed. 1112 (1927), in which the Court upheld a state law requiring a single railroad to pave streets used by its trains. The act was "in form a general statute, but by reason of provisions making it applicable [only to railways with certain characteristics] it in fact applied to plaintiff in error alone." 274 U.S. at 389, 47 S.Ct. at 596. The statute was held not to violate the equal protection guarantee because plaintiff's roads had unique characteristics, and equal protection "does not require the uniform application of legislation to objects that are different, where those differences may be made the rational basis of legislative discrimination." *Id.* at 391, 47 S.Ct. at 597.

More recent cases make it clear that we are confined to the rational basis test in reviewing the Act challenged by Maine Central. In *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Court reviewed legislation that was enacted to gain public access to presidential materials. The object of the legislation, who was identified by name, abandoned an equal protection argument because, according to the Court, he "apparently recogniz[ed] that

mere underinclusiveness is not fatal to the validity of a law under the equal protection component of the Fifth Amendment." *Id.* at 471 n. 33, 97 S.Ct. at 2804 n. 33.

Obviously, the legislation at issue in *Nixon* was extraordinary. Maine Central argues that this explains the Court's deference to the legislature in that case, and a legislative burden imposed on a "class of one" can only be justified in "unique or compelling circumstances." Otherwise, according to Maine Central, if there is one person in the class, the statute must be "drawn in general terms, so that if, in the future, other persons become similarly situated, they will fall within the statute's prescriptions."

Our research leads us to conclude otherwise. A classification does not become irrational or unconstitutional solely because it is specific. Two Supreme Court cases demonstrate this point. In *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the Court overruled *Morey v. Doud,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), a case in which it had invalidated a statute identifying a "class of one" by name. In *Morey,* the Court considered the constitutionality of a currency exchange regulatory statute that excluded the American Express Company from its provisions. It said "a statutory discrimination must be based on differences that are reasonably related to the purposes of the Act in which it is found." 354 U.S. at 465, 77 S.Ct. at 1349. The Court noted that "genuinely different characteristics" may justify different treatment, "even where the discrimination is by name." *Id.* at 466, 77 S.Ct. at 1350. The Court nevertheless invalidated the statute, holding that the discrimination in favor of the American Express Company did not conform to the statute's purpose of protecting the public. *Id.* at 466–69, 77 S.Ct. at 1350–52.

lature's judgment in imposing tax burdens. *See Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 547, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes."); *Madden v. Kentucky,* 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84

L.Ed. 590 (1940) ("[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification.... [T]he presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes.").

In deciding that the statute was unconstitutional, the Court relied, at least in part, on the possibility that the American Express Company would continue to be exempt if its characteristics were to change, but competitors would continue to be subject to the statute even if their characteristics became identical to the American Express Company's. *Id.* at 467, 77 S.Ct. 1351. Justice Frankfurter dissented. His position was that a state is entitled to legislate "on the basis of circumstances that exist"; its acts are not unconstitutional when passed because they would be "in speculatively different circumstances that may never come to pass." *Id.* at 474, 77 S.Ct. at 1354 (Frankfurter, J., dissenting).[8]

Justice Frankfurter's position has since prevailed. The Court overruled *Morey*. It rejected the analysis that had been employed in that case and described "the reliance on the statute's potential irrationality" as "a needlessly intrusive judicial infringement on the State's legislative powers." *City of New Orleans v. Dukes*, 427 U.S. at 306, 96 S.Ct. at 2518. Maine Central's position that legislation must be written in such a manner as to accommodate the contingency that someone else may become similarly situated is untenable in the light of this admonition.

The Court's holding in *Dukes* confirms that our inquiry is confined to the rational basis test. The Court rejected an equal protection challenge to an ordinance prohibiting pushcart food sales in the French Quarter of New Orleans, except for vendors who had operated there for at least eight years. There were only two such vendors. *Id.* at 300, 96 S.Ct. at 2515. The Court said that "[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *Id.* at 303, 96 S.Ct. at 2516.

The Act at issue here, therefore, is subject only to the qualification that it must "be rationally related to a legitimate state interest." *Id.* The Act's purpose was very clear: "[T]o provide for a temporary prohibition of strikes or lockouts with respect to the Maine Central Railroad Company and Portland Terminal Company labor-management dispute." 100 Stat. at 819. The legitimacy of congressional interest in preventing disruptive interstate railroad labor disputes is firmly entrenched in constitutional law. Congress enacted this legislation because the usual procedures for dispute resolution were unsuccessful in heading off what it perceived to be a substantial threat to essential transportation services. *See* 100 Stat. at 819; H.R.Rep. 99–784, 99th Cong., 2d Sess. 10 (1986).[9] The Act, therefore, had a legitimate national purpose.

The focus on the Maine Central-BMWE dispute had a rational relationship to this legitimate purpose. Maine Central was not selected from among a group of similarly situated railroads. Maine Central and BMWE were the parties to the dispute "out

---

8. Justice Frankfurter said:

"Sociologically one may think what one may of the State's recognition of the special financial position obviously enjoyed by the American Express Co. Whatever one may think is none of this Court's business. In applying the Equal Protection Clause, we must be fastidiously careful to observe the admonition of Mr. Justice Brandeis, Mr. Justice Stone, and Mr. Justice Cardozo that we do not 'sit as a super-legislature.'" (See their dissenting opinion in the ill-fated case of *Colgate v. Harvey*, 296 U.S. 404, 441, [56 S.Ct. 252, 264, 80 L.Ed. 299 1935]. See also *Asbury Hospital v. Cass County*, 326 U.S. 207, 214–215 [66 S.Ct. 61, 64–65, 90 L.Ed. 6 1945].).

354 U.S. at 475, 77 S.Ct. at 1355.

9. When the President signed the Act into law, he said:

This Administration is against the intervention of the Federal government in the resolution of limited, isolated labor disputes. However, all the procedures in the Railway Labor Act for settling the Maine Central-BMWE dispute have been exhausted, and as a result of recent court decisions, the possibility exists of a national railroad strike stemming from this unresolved dispute.

I earnestly hope that the parties will avail themselves of the additional cooling-off period ... to settle their dispute.

Statement by the President of the United States, 22 Weekly Comp. Pres.Doc. 1119 (Aug. 25, 1986).

of which the threat of interruption of interstate commerce arose,—a consideration which establishes an adequate basis for the statutory classification." *Wilson v. New,* 243 U.S. at 354, 37 S.Ct. at 304. Although Congress has not enacted a general prohibition on secondary picketing once the established Railway Labor Act procedures have run their course, *see Brotherhood of Maintenance of Way Employees v. Guilford Trans. Indus., Inc.,* 803 F.2d 1228, 1231 (1st Cir.1986), it is not arbitrary or irrational to extend the Railway Labor Act mechanism for sixty days in the face of a strike threatening interstate commerce, rather than to prohibit such strikes in general. Congress is entitled to "take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical Co.,* 348 U.S. at 489, 75 S.Ct. at 465. There may be hundreds of active railroad labor disputes, and, as Maine Central points out, others may turn out to have national impact, but it was the Maine Central-BMWE dispute that in Congress's judgment was threatening to disrupt interstate commerce. This was not arbitrary or irrational; the Act, therefore, did not violate the equal protection component of the fifth amendment.

### B. Separation of Powers

■ It is a fundamental principle of our federal government that the legislative, executive, and judicial branches "be largely separate from one another." *Buckley v. Valeo,* 424 U.S. 1, 120, 96 S.Ct. 612, 683, 46 L.Ed.2d 657 (1976). "Although not 'hermetically' sealed from one another, *Buckley v. Valeo,* 424 U.S., at 121, 96 S.Ct. at 683, the powers delegated to the three Branches are functionally identifiable." *INS v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983).

Determining whether an act is an exercise of powers designated to a particular branch, however, is a difficult task. The Court has said that an act is an exercise of legislative power when it is "essentially legislative in purpose and effect." *Id.* at 952, 103 S.Ct. at 2784. But the distinction between legislative and adjudicative purposes and effects can be illusory. As Justice Holmes said: "To make a rule of conduct applicable to an individual who but for such action would be free from it is to legislate—yet it is what the judges do whenever they determine which of two competing principles of policy shall prevail." *Springer v. Philippine Islands,* 277 U.S. 189, 210, 48 S.Ct. 480, 485, 72 L.Ed. 845 (1928) (Holmes, J., dissenting).

Maine Central argues that by prohibiting only it and BMWE from exercising self-help, instead of enacting legislation that generally imposed a cooling-off period on any railroad labor dispute having certain characteristics, Congress was adjudicating rather than legislating. Therefore, while the ends may have been legitimate, the means employed were improper. Maine Central points to Chief Justice Marshall's words in *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 136, 3 L.Ed. 162 (1810): "It is the peculiar province of the legislature, to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." This general observation by Chief Justice Marshall was made in the context of his inquiry into "whether the nature of society and of government does not prescribe some limits to the legislative power." 10 U.S. (6 Cranch) at 135. In the passage following the one quoted by Maine Central, he also said: "How far the power of giving the law may involve every other power, in cases where the constitution is silent, never has been, and perhaps never can be, definitely stated." *Id.* at 136. Chief Justice Marshall, therefore, was speaking of general governmental principles, and not creating a benchmark for determining whether an act is legislative or adjudicative.

A statute aimed at specific individuals runs the risk of becoming an instrument that realigns particular parties' rights. "Congress is most accountable politically when it prescribes rules of general applicability. When it decides rights of specific persons, those rights are subject to 'the tyranny of a shifting majority.'" *INS v. Chadha,* 462 U.S. at 966, 103 S.Ct. at 2792

(Powell, J., concurring) (quoting Levi, *Some Aspects of Separation of Powers,* 76 Colum.L.Rev. 371, 375 (1976)). The legislation at issue here, however, was merely an extension to a constitutionally valid scheme for encouraging dispute resolution by preserving existing rights. In the face of a threat that interstate railroad traffic may be seriously interrupted, Congress's enumerated power to regulate interstate commerce "necessarily obtained and was subject to be applied to the extent necessary to provide a remedy for the situation, which included the power to deal with the dispute." *Wilson v. New,* 243 U.S. at 348, 37 S.Ct. at 301. The Act did not determine who "shall prevail." It was not addressed to a justiciable case or controversy, which is the exclusive province of the judiciary. *See INS v. Chadha,* 462 U.S. at 957 n. 22, 103 S.Ct. at 2787 n. 22. Legislation that does not interfere with the performance of another branch's constitutional authority does not involve the dangers the separation of powers is meant to avoid. *See Nixon v. Administrator of General Services,* 433 U.S. at 443, 97 S.Ct. at 2790.

Nothing in the Constitution says that a statute must be general in form to be legislative in nature. Unlike some state constitutions, the federal Constitution does not prohibit Congress from passing private acts that affect specific individuals. *United States v. Brown,* 381 U.S. 437, 473, 85 S.Ct. 1707, 1727, 14 L.Ed.2d 484 (1965) (White, J., dissenting); *Paramino Lumber Co. v. Marshall,* 309 U.S. 370, 380, 60 S.Ct. 600, 603, 84 L.Ed. 814 (1940). The bill of attainder clause proscribes Congress from enacting statutes, "no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Lovett,* 328 U.S. 303, 315–16, 66 S.Ct. 1073, 1078–79, 90 L.Ed. 1252 (1946). The statute at issue here does not impose punishment "of any form or severity." *United States v. Brown,* 381 U.S. at 447, 85 S.Ct. at 1714.

In *Nixon v. Administrator of General Services,* 433 U.S. at 425, 97 S.Ct. at 2781, the Court, in discussing the bill of attainder clause, rejected an argument that "the Constitution is offended whenever a law imposes undesired consequences on an individual or on a class that is not defined at a proper level of generality." *Id.* at 469–70, 97 S.Ct. at 2803. The Court said that this "view would cripple the very process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality." *Id.* at 470, 97 S.Ct. at 2804. This reasoning applies equally as well to a statute not alleged to be a bill of attainder. If legislation with a legitimate state purpose and classification becomes nonlegislative solely because it was not "defined at a proper level of generality," then legislation that affects only a few—no matter what its purpose or the legitimacy of the classification—becomes vulnerable to constitutional attack. We conclude, therefore, that a law that is an otherwise valid exercise of legislative authority does not go beyond that authority solely because it affects a named few, and we hold that the Act did not violate the separation of powers doctrine.

### III.  CONCLUSION

Congress was concerned that the Maine Central-BMWE labor dispute would seriously disrupt interstate railroad traffic. It could have addressed this threat by amending the Railway Labor Act procedures. But it did not. It opted to take the smaller step of extending the cooling-off period for an additional sixty days for these two parties. Given the deference the courts owe to Congress when it enacts economic legislation, this decision to focus on the Maine Central-BMWE dispute did not violate the constitutional guarantee of equal protection of the laws. Congress exercised its power over interstate commerce with this legislation; it did not interfere with the judiciary's exclusive authority over cases and controversies, and, therefore, it did not violate the separation of powers doctrine. We affirm the district court's decision that the Act was constitutional.

*Affirmed.*