The MAINE CENTRAL RAILROAD COMPANY, et al., Plaintiffs, Appellants,

v.

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, et al., Defendants, Appellees.

No. 87-1309.

United States Court of Appeals, First Circuit.

Heard Sept. 14, 1987.

Decided Dec. 11, 1987.

John Spelman with whom Andrew O. Schiff and Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa., were on brief, for plaintiffs, appellants.

Jeffrey Clair, Appellate Staff, Civ. Div., Dept. of Justice, with whom William Kanter, Appellate Staff, Civ. Div., Dept. of Justice, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., and Richard S. Cohen, U.S. Atty., Portland, Me., were on brief, for defendant, appellee Nat. Mediation Bd.

Richard S. Edelman with whom John O'B. Clarke, Jr., and Highsaw & Mahoney, P.C., were on brief, for defendant, appellee Broth. of Maintenance of Way Employees.

Before COFFIN, ALDRICH and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

This case comes to us on Maine Central Railroad Company's appeal from summary judgment in its action seeking to enjoin operation of Pub.L. No. 99-431, 100 Stat. 987 (Sept. 30, 1986) (the "Second Act"). We consider, on appeal, whether Congress properly imposed certain financial burdens on Maine Central and its wholly-owned subsidiary, the Portland Terminal Co. (hereinafter, collectively, the "Railroad" or

"Maine Central"), in order to resolve a labor dispute between the Railroad and certain of its employees. Appellant urges us to hold that such individualized attention, in this case and in view of the specific burdens imposed, violates the Equal Protection and Due Process components of the fifth amendment to the Constitution; or that Congress' chosen method of resolving the dispute violates the doctrine of separation of powers.

The labor dispute may at one time have been an "isolated collective bargaining dispute between a small Maine railroad and a national labor organization." Appellant's Brief at 3. As a result of nationwide secondary striking, however, it snowballed to affect railroads across the nation, and to involve the state courts of Maine, several federal district courts, the First, Second and Seventh Circuits, and even the Supreme Court of the United States. *See Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employes*, — U.S. —, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). Indeed, even the intervention of the President of the United States himself has become necessary in this "isolated collective bargaining dispute," through the appointment of Emergency Board 209 on May 16, 1986, *see* 45 U.S.C. § 160.

Nor is Congress a stranger to the dispute. The creation of an Emergency Board, under 45 U.S.C. § 160, automatically entails a "cooling off" or moratorium period. While this moratorium temporarily stopped the strike, it expired without bringing about an end to the dispute. As a result, Congress statutorily extended the moratorium in the "First Act." Pub.L. No. 99–385, 100 Stat. 819 (Aug. 21, 1986). We upheld that law in an earlier suit and appeal concerning many of the same issues raised today. *See Maine Central Railroad Co. v. Brotherhood of Maintenance of Way Employees*, 813 F.2d 484 (1st Cir. 1987) (*Maine Central I*). Despite this additional hiatus the parties again failed to settle their differences during the enforced cease-fire, as a result of which Congress passed the Second Act, ending the war by legislating substantive resolution of all the underlying differences, and mandating binding arbitration for any "unresolved implementing issues." The Second Act, in its entirety, is reproduced in the Appendix.

The specific terms of the Second Act also have a long history. Emergency Board 209, mentioned above, held hearings at which both parties were represented and were given every opportunity to present their positions. The Board then issued a report which essentially adopted a proposal made by the Railroad to the Union during earlier negotiations (with the sole exception that the Board granted protection payments of $26,000 per employee, rather than $20,000). The Union, but not the Railroad, accepted this proposal during the ensuing 30–day moratorium.

When the First Act extended the moratorium an additional 60 days, it also created a Congressional Advisory Board which was to report to Congress on the progress of negotiations, relevant financial and other circumstances, and any developments since the beginning of the strike against Maine Central. It is evident from the report of the Advisory Board, reproduced in the parties' Joint Appendix at p. 380a, that Maine Central was able to submit exhibits and briefs, with information updating that presented to the Emergency Board.

After painstaking examination of the parties' contentions, and the financial condition of Guilford (Maine Central's parent corporation), the Advisory Board rejected the argument that the strike had so changed the condition of the Railroad as to render Maine Central's earlier proposal no longer feasible. Joint Appendix at 405a. The Advisory Board recommended that:

> In the absence of agreement between the parties disposing of this dispute no later than September 13, 1986, the Congress should enact legislation directing the parties to accept and apply the recommendations of [Emergency Board] 209. Should the parties be unable to agree as to all necessary details in applying the recommendations by October 1, 1986 any unsettled issues should be submitted to final and binding arbitration before an arbitrator designated by the [National Mediation Board].

Joint Appendix at 413a.

With very little debate, the Congress adopted the recommendations of the two Boards, and passed Senate Joint Resolution 415, which became law (the Second Act) when the President signed it on September 30, 1986.

It is this law that is said to contravene the Equal Protection component of the fifth amendment to the United States Constitution. At the outset, Maine Central concedes that, under our holding in *Maine Central I*, the legislation at issue need only survive the so-called minimum rationality test: "Economic legislation, ... 'that does not employ suspect classifications or im-

pinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose.'" *Maine Central I,* 813 F.2d at 488 (quoting *Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981)).

Maine Central also grants that the act's stated purpose —"that essential transportation services be maintained"—is legitimate. It claims, however, that the classification chosen by Congress to achieve this purpose is completely arbitrary or irrational. Appellant argues that "nothing unique to the Railroad's past labor dispute justifies [the Act's] specific and severe burdens." Appellant's Brief at 21. The Railroad's singularity, however, has been addressed already in *Maine Central I.* There we concluded:

> There may be hundreds of active railroad labor disputes, and, as Maine Central points out, others may turn out to have national impact, but it was the Maine Central–BMWE dispute that in Congress' judgment was threatening to disrupt interstate commerce. This was not arbitrary or irrational; the Act, therefore, did not violate the equal protection component of the fifth amendment.

*Id.* at 492. It was the same threat, caused by the same dispute, that Congress was dealing with in the Second Act. Nothing occurred, between the two Acts, to rid Maine Central of its uniqueness.

Justice Brennan, in a different context, remarked on the rarity of a railway labor dispute causing such widespread disruption of transportation services as in this case:

> "In the history of the Railway Labor Act there have been only three widely-known labor disputes in which rail unions have undertaken any secondary economic activity." Brief for National Railway Labor Conference as *Amicus Curiae* 27. In making this statement, *amicus* refers to the Florida East Coast Railway dispute of the early 1960's, see *Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); the 1978 dispute between the Norfolk and Western Railway and the Brotherhood of Railway and Airline Clerks, see *Consolidated Rail Corp. v. Railway Clerks,* 99 BNA LRRM 2607 (WDNY 1978), appeal dismissed as moot, 595 F.2d 1208 (CA2 1979); and the dispute at issue here involving Guilford and BMWE. Brief of *Amicus Curiae, supra,* at 27.

*Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employes,* —— U.S. ——, 107 S.Ct. 1841, 1855 n. 16, 95 L.Ed.2d 381 (1987).

It is evident, therefore, that targeting the Maine Central–BMWE dispute is not "a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 446, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985). Faced with a dispute which threatened rail transportation across the country, Congress moved to resolve that dispute alone.

Maine Central may still argue that the means chosen are not rationally related to the purpose Congress sought to achieve. We note that the test does not require us to find that Congress used the best, or even the fairest method to solve the perceived national problem: "[i]t is enough that [the Court is] able to perceive a basis upon which the Congress might resolve the conflict as it did." *Katzenbach v. Morgan,* 384 U.S. 641, 653, 86 S.Ct. 1717, 1725, 16 L.Ed.2d 828 (1966).

Maine Central's principal contention appears to be that secondary activity, picketing for example, is in general the evil Congress sought to address. The Railroad then depicts potentially crippling secondary activity as looming over the entire railroad industry, as a result of any one of several hundred ongoing labor disputes. Finally, it points to the provisions of the Second Act, which admittedly do not even proscribe secondary picketing in future disputes between Maine Central and the BMWE. Maine Central concludes that the provisions lack minimum rationality because they do nothing to address the larger problem, which is ensuring the continued operation of the country's railways in the face of the overarching threat of secondary activity. Congress, in effect, should have limited itself to forbidding secondary picketing.

It is entirely possible, indeed likely since they are obviously aware of the problem, that Congress does not, as a general principle, share Maine Central's views as to secondary action in the railroad industry. In fact, the Supreme Court in 1968 said that "[n]o cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries." *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 386, 89 S.Ct. 1109, 1120, 22 L.Ed.2d 344 (1969). More recently, the Court announced that "[i]n the Norris–La Guardia Act, Congress divested federal courts of the power to enjoin secondary picketing in railway labor

disputes. Congress has not seen fit to restore that power." *Burlington Northern,* 107 S.Ct. at 1855. It is less than wild supposition, therefore, to hypothesize that Congress does not wish to completely eliminate the weapon of secondary action from the railway workers' self-help arsenal. The legislature may rationally decide to allow the unions the use of this powerful economic tool, and yet curb its effects when they reach crisis proportions. As already remarked, it does not appear, from the history of the Railway Labor Act, that secondary activity is so endemic as to require that in order to act rationally, Congress must act to prohibit it in all instances, rather than resolving a particular crisis as it arises.

The Supreme Court strongly suggests that this carefully balanced interplay between unbridled self-help and potential direct congressional intervention is relevant to whatever success the Railway Labor Act may have had in promoting stability in that industry:

> Furthermore, as this case illustrates, § 10 of the RLA provides a ready mechanism for the Executive Branch to intervene and interrupt any self-help measures by invoking an Emergency Board and thereby imposing at a minimum a 60–day cooling-off period. If the Board's recommendations are not initially accepted by the parties, Congress has the power to enforce the Board's recommendation by statute, as it has done here. Allowing secondary picketing in the self-help period is thus not inconsistent with the structure or purpose of the Act, and may in fact increase the likelihood of settlement prior to self-help.

*Burlington Northern,* 107 S.Ct. at 1854–55.[1]

█ Congress' power to intervene in a railway labor dispute was recognized in clear terms in *Wilson v. New,* 243 U.S. 332, 37 S.Ct. 298, 61 L.Ed. 755 (1916), where the Court upheld an act of Congress imposing specific terms on the parties to such a dispute:

> [T]here would seem to be no ground for disputing the power which was exercised in the act which is before us so as to prescribe by law for the absence of a standard of wages caused by the failure to exercise the private right as a result of the dispute between the parties, *that is, to exert the legislative will for the purpose of settling the dispute and bind both parties to the duty of acceptance and compliance* to the end that no individual dispute or difference might bring ruin to the vast interests concerned in the movement of interstate commerce, for the express purpose of protecting and preserving which the plenary legislative authority granted to Congress was reposed.

*Id.* at 350, 37 S.Ct. at 302 (emphasis supplied).

We note further that Congress is clearly entitled to deal with a problem in "piecemeal" fashion rather than attempting to deal with every conceivable situation at once. *Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). It has the power, therefore, to deal with each crisis as it arises, rather than trying to forestall any and all threats to railway transportation with one statute.

█ The final contention to deal with is that it is irrational to grant protection payments and back pay to workers who are no longer in the industry, in the expectation of future gains. This the Railroad labels retroactive legislation, and attacks, likening it to the legislation struck down in *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (Alaska statute distributing mineral dividends on basis of length of in-state residency). In this case, however, the dispute was ongoing, and it concerned precisely the issues addressed by the so-called retroactive legislation—protection payments and workforce reduction. Congress may well have decided that in order to avoid festering sores later, it should address all the issues in dispute and resolve them.

---

**1.** Nor is this a completely isolated case of congressional resolution, in substantive terms, of a railway labor dispute. *See* Pub.L. No. 88–108, 77 Stat. 132 (Aug. 28, 1963) (constitutionality upheld in *Brotherhood of Firemen & Enginemen v. Chicago, B. & Q. R.R. Co.,* 225 F.Supp. 11 (D.D.C.), *aff'd per curiam,* 331 F.2d 1020 (D.C. Cir.), *cert. denied,* 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964)); Pub.L. No. 90–10, 81 Stat. 12 (April 12, 1967); Pub.L. No. 90–13, 81 Stat. 13 (May 2, 1967); Pub.L. No. 90–54, 81 Stat. 122 (July 17, 1967); Pub.L. No. 91–203, 84 Stat. 22 (March 4, 1970); Pub.L. No. 91–541, 84 Stat. 1407 (Dec. 10, 1970) (constitutionality upheld in *Louisville & N.R.R. Co. v. Bass,* 328 F.Supp. 732 (W.D.Ky.1971)); Pub.L. No. 92–17, 85 Stat. 39 (May 18, 1971); Pub.L. No. 93–5, 87 Stat. 5 (Feb. 9, 1973); Pub.L. No. 97–262, 96 Stat. 1130 (Sept. 22, 1982). All of these acts, however, unlike the Second Act, resolved more or less nationwide disputes, although by their terms they targeted only the parties to each dispute.

While Maine Central sees this Act as imposing burdens on only one entity, it should be noted that the Act demands concessions from both parties, thus affecting all of the Maine Central workers represented by the BMWE. The Railroad, in exchange for terms it had been willing to grant earlier, was given the right to a certain maintenance schedule and workforce reduction. It is not for us to decide if $26,000 in protection payments is too much or too little, as long as these payments rationally relate to settlement of the dispute that continued to threaten to paralyze rail traffic in various parts of the country.

The Railroad says "[t]here is no doubt that the Second Act resolves (for the time being) this dispute. However, the constitutional issue presented is whether the means Congress chose to resolve the dispute relate to any legitimate state purpose." Reply Brief of Appellant, at p. 3, n. 1. Congress chose not to strip the Union of its self-help remedies, thereby allowing the Railroad a free hand in changing working conditions. Instead, it imposed a solution it found equitable, one recommended by two impartial Boards, after hearings, and one that definitively laid to rest the concerns that had given rise to the labor unrest. Had it not done this, it is entirely possible that a new, disruptive labor dispute would again arise. We find therefore, that the classification, scope, and terms of the Second Act are all rationally related to the end of ensuring continued railroad service.

The test for legislation under the Due Process component of the Fifth amendment is no less deferential than the Equal Protection test, nor does it differ for retroactive legislation. "[A]lthough we have noted that retrospective civil legislation may offend due process if it is 'particularly "harsh and oppressive," ' ... that standard does not differ from the prohibition against arbitrary and irrational legislation that we clearly enunciated in [*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) ]." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733, 104 S.Ct. 2709, 2720, 81 L.Ed.2d 601 (1984) (citations omitted, quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1977)).

■ The Second Act, therefore, would offend due process only if the terms of the forced settlement are arbitrary or irrational or if applying those terms to ex-employees as well as present employees is arbitrary or irrational. *Pension Benefit Guaranty Corp.*, 467 U.S. at 730, 104 S.Ct. at 2718. As we explained above, neither of these propositions is true. The Second Act does not, therefore, violate the guarantees of due process embodied in the Fifth amendment.[2]

■ Next we address Maine Central's argument that the Second Act is an adjudication, in violation of the doctrine of separation of powers. We need not reestablish the proposition that "a law that is an otherwise valid exercise of legislative authority does not go beyond that authority solely because it affects a named few." *Maine Central I*, 813 F.2d 484, 493 (1st Cir.1987). Appellant recognizes that, but goes on to say that the Second Act's failing consists of realigning particular parties' rights, explaining that "the Second Act focuses on two active disputants and purports to decide the merits of the controversy between them." Appellants' Brief, at 30.

Turning first to the character of the dispute, we note that Congress did not in this case intervene in the midst of a justiciable controversy. *Cf. Benoni v. Boston and Maine Corp.*, 828 F.2d 52 (1st Cir.1987). Rather, the parties were in the self-help stage of Railway Labor Act procedures, and no judicial action could have been brought by either party to bring about resolution of the dispute. We cannot find a legislative encroachment on judicial powers, where the judiciary was powerless to act in the controversy.

Furthermore, Congress did not decide the dispute on the basis of pre-existing rules, interpreting and applying the law. As the district court found, "the Second Act has 'the purpose and effect of altering legal rights, duties, and relations of persons, ... all outside the Legislative Branch.' [*INS v. Chadha*, 462 U.S. 919, 952, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) ]. This purpose and effect is legislative." *Maine Central*, 657 F.Supp. 971, 981. Congress weighed broad issues of policy affecting the national economy, and imposed certain rules on Maine Central and the BMWE. Prior to the Second Act, there

2. Procedural due process is not directly raised in the briefs. In any event it is hard to imagine what more Congress could have done in that respect. The Railroad actively participated in two separate hearings before impartial boards, with full opportunity to present its arguments and evidence. See the discussion of the district court in this regard. *Maine Central Railroad Co. v. Brotherhood of Maintenance of Way Employees*, 657 F.Supp. 971 (D.Me.1987).

were no relevant rules applicable to the situation, and then Congress enacted certain rules to effect it.

In *Maine Central I*, we noted Justice Holmes' statement that "[t]o make a rule of conduct applicable to an individual who but for such action would be free from it is to legislate...." *Springer v. Phillipine Islands*, 277 U.S. 189, 210, 48 S.Ct. 480, 485, 72 L.Ed. 845 (Holmes, J., dissenting); *see also Air Line Pilots Ass'n International v. Quesada*, 276 F.2d 892, 896 (2d Cir.1960) ("Adjudication ... is the application of a ... legal standard to a given situation...."). Difficult as it is at times to distinguish the different governmental functions, there is no doubt that here Congress was creating rules, not merely applying them to a given situation.

■ The last infirmity attributed by Maine Central to this Act is that it effects an unconstitutionally standardless delegation of legislative authority, in that it imposes mandatory arbitration of unresolved implementing issues without giving the arbitrator any guiding decisional principles. The Supreme Court has stated that we need not find these guidelines explicit in the Act. "A term that appears vague on its face 'may derive much meaningful content from the purpose of the Act, its factual background, and the statutory context.' *American Power & Light Co. v. SEC*, 329 U.S. 90, 104 [67 S.Ct. 133, 142, 91 L.Ed. 103] (1946). Although FIFRA's language does not impose an explicit standard, the legislative history of [the amendments at issue] is far from silent." *Thomas v. Union Carbide Agricultural Products Co.*,

473 U.S. 568, 593, 105 S.Ct. 3325, 3339–40, 87 L.Ed.2d 409 (1985) (remanding for consideration of standardless delegation issue).

Traditionally, the Supreme Court has not required a great deal of precision in the standards imposed on Congressional delegates:

"Just and reasonable" rates for sales of natural gas; "public interest, convenience, or necessity" in establishing rules and regulations under the Federal Communications Act; prices yielding a "fair return" or the "fair value" of property; "unfair methods of competition" distinct from offenses defined under the common law; "just and reasonable" rates for the services of commission men; and "fair and reasonable" rent for premises, with final determination in the courts.

*Lichter v. United States*, 334 U.S. 742, 786, 68 S.Ct. 1294, 1317, 92 L.Ed. 1694 (1948) (citations omitted) (upholding "excess profits" as standard for taxation purposes). The district court properly recognized that this arbitration was far from being devoid of Congressional guidance.[3] If the guidelines quoted above, in *Lichter*, are sufficient, then surely it is sufficient to tell an arbitral body that it must "implement" an Act, with precise recommendations, the purpose of which is to ensure uninterrupted railroad transportation through the resolution of this labor dispute; and, furthermore, that the arbitration must be conducted in accordance with the Railway Labor Act.

For the above-stated reason, the judgment of the district court is *affirmed*.

---

3. The district court found the following standards in the Second Act:

"[T]he Second Act specifically refers to the report and recommendations of Emergency Board No. 209 as defining the basis for the unresolved implementing issues that were to be arbitrated in the present dispute. This reference sufficiently defines the scope of the arbitration. In addition, the recommendations themselves provide the following standards: one, job protection payments should be provided for employees who were 'currently active' as of March 3, 1986; two, the parties should agree to system seniority for production work 'similar to those agreements negotiated on the Boston & Maine and the Delaware & Hudson rail lines of the Guilford System' with a per diem allowance 'not less than that which is currently paid to maintenance of way employees' in the Guilford system; three, changes in rates of pay and health and welfare programs should be governed by the results of national negotiations; four,

changes in local rules and working conditions should be addressed under the Railway Labor Act 'up to but not including mandatory arbitration or resort to self-help.' Moreover, the Second Act provides that section 7 of the Railway Labor Act should control the actual arbitration. By bringing the arbitration within the Railway Labor Act, Congress clearly provided adequate standards for the conduct of the arbitration. Finally, because binding arbitration is an explicit, albeit usually voluntary, provision of the Railway Labor Act, 45 U.S.C. § 157, the standards for the present mandatory arbitration may be derived from the Railway Labor Act itself. When these standards are combined with the factual background of the current dispute and the recommendations of Emergency Board No. 209, both of which arose from the Railway Labor Act, the Court finds that Congress has provided sufficient standards for this arbitration."

*Maine Central*, 657 F.Supp. 971, 987.

## APPENDIX

Terminal Company labor-management dispute.

Whereas the labor dispute between the common rail carriers, Maine Central Railroad Company and Portland Terminal Company, and certain of the employees of such carriers represented by the Brotherhood of Maintenance of Way Employees threatens essential transportation services of the Nation;

Whereas it is essential to the national interest, including the national health and defense, that essential transportation services be maintained;

Whereas the Congress finds that emergency measures are essential to security and continuity of transportation services by such carriers;

Whereas the President by Executive Order Numbered 12557 of May 16, 1986, pursuant to the provisions of section 10 of the Railway Labor Act (45 U.S.C. 160), created a Presidential Emergency Board to investigate the dispute and report findings;

Whereas the recommendations of Presidential Emergency Board Numbered 209 for settlement of such dispute have not yet resulted in a settlement;

Whereas the extension of the provisions of section 10 of the Railway Labor Act (45 U.S.C. 160) for an additional 60–day period to such dispute provided by the joint resolution entitled: "Joint resolution to provide for a temporary prohibition of strikes or lockouts with respect to the Maine Central Railroad Company and the Portland Terminal Company labor-management dispute", approved August 21, 1986 (Public Law 99–385), has not yet resulted in a settlement of such dispute;

Whereas the advisory board established pursuant to section 2 of such joint resolution recommended that in the event that the parties to the dispute were unable to reach agreement on the dispute before September 13, 1986, the Congress should enact legislation directing the parties to accept and apply the recommendations of Emergency Board Numbered 209, and if such parties are unable to agree as to all necessary details in applying the recommendations of such Emergency Board, all such unsettled issues should be submitted to final and binding arbitration;

Whereas all the procedures for resolving such dispute provided for in the Railway Labor Act have been exhausted and have not yet resulted in settlement of the dispute;

Whereas the Congress, under the Commerce Clause of the Constitution, has the authority and responsibility to ensure the uninterrupted operation of essential transportation services; and

Whereas the Congress in the past has enacted legislation for such purposes: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following

conditions shall apply to the dispute referred to in Executive Order Numbered 12557 of May 16, 1986, between the common rail carriers, Maine Central Railroad Company and Portland Terminal Company (hereafter in this resolution referred to as the "carriers") and the employees of such carriers represented by the Brotherhood of Maintenance of Way Employees.

(1) The parties to such dispute shall take all necessary steps to restore or preserve the conditions out of which such dispute arose as such conditions existed before 12:01 ante meridiem of March 3, 1986, except as provided in paragraphs (2) through (4).

(2) The report and recommendations of Presidential Emergency Board Numbered 209 shall be binding on the parties and shall have the same effect as though arrived at by agreement of the parties under the Railway Labor Act (45 U.S.C. 151 et seq.), except that nothing in this joint resolution shall prevent a mutual written agreement by the parties to any terms and conditions different from those established by this joint resolution.

(3)(A) If there are unresolved implementing issues remaining with respect to the report and recommendations or agreement under paragraph (2) after ten days after the date of the enactment of this joint resolution, the parties to the dispute shall enter into binding arbitration to provide for a resolution of such issues.

(B) The National Mediation Board established by section 4 of the Railway Labor Act (45 U.S.C. 154) shall appoint an arbitrator to resolve the issues described in subparagraph (A). Except as provided in this joint resolution, such arbitration shall be conducted as if it were under section 7 of such Act, and any award of such arbitration shall be en-

forceable as if under section 9 of such Act.

(4) Within thirty days after the date of the enactment of this joint resolution, the binding arbitration entered into pursuant to paragraph (3) shall be completed.