The MAINE CENTRAL RAILROAD COMPANY, and the Portland Terminal Company, Plaintiffs,

v.

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, and National Mediation Board, Defendants.

Civ. No. 86–0311 P.

United States District Court, D. Maine.

March 31, 1987.

John Spelman, Philadelphia, Pa., Charles S. Einsiedler, Jr., Portland, Me., for plaintiffs.

John O'B. Clarke, Jr., Washington, D.C., Craig J. Rancourt, Biddeford, Me., for defendant Broth.

David R. Collins, Asst. U.S. Atty., Portland, Me., Thomas Millet, Dept. of Justice, Washington, D.C., for defendant Nat. Mediation Bd.

## OPINION AND ORDER

GENE CARTER, District Judge.

This case is before the Court for a decision on the merits regarding the constitutionality of a special act of Congress, Pub.L. 99–431, 100 Stat. 987 (Sept. 30, 1986), which effectively ended the long labor dispute between Plaintiffs, Maine Central Railroad Company and Portland Terminal Company (the Railroad), and Defendant Brotherhood of Maintenance of Way Employes [1] (BMWE). The Railroad and BMWE have brought the case forward for decision on cross motions for Summary Judgment; in addition, Defendant National Mediation Board (the Board) has filed a Motion to Dismiss, alleging that no justiciable controversy exists as to the Board. Fed.R.Civ.P. 12(b)(6). The Court finds that there is no genuine issue of material fact regarding the constitutionality of Public Law 99–431 and that summary judgment is therefore appropriate at this time. For the reasons developed more fully below, the Court holds that the above-cited special act of Congress is constitutional and therefore grants Defendant BMWE's Motion for Summary Judgment. In addition, the Court finds no justiciable controversy as to the Board and therefore grants Defendant Board's Motion to Dismiss.

## I. FACTUAL BACKGROUND

The present case is but one in a series of cases that have arisen from BMWE's attempts to obtain an employee protective agreement with the Railroad in response to the Railroad's massive furloughs of maintenance of way employees. The actual underlying dispute arose on April 2, 1984 when BMWE, in compliance with Section 6 of the Railway Labor Act (45 U.S.C. § 156), served notice on the Railroad of BMWE's desire to change the existing collective bargaining agreements between the parties. The factual background of the dispute has been detailed at length in several related cases, *see Railway Labor Executives' Ass'n v. Boston & Maine Corp.*, 808 F.2d 150, 152–56 (1st Cir.), *aff'g in part, rev'g in part* 639 F.Supp. 1092 (D.Me.1986); *Brotherhood of Maintenance of Way Employees v. Guilford Transp. Indus.*, 803

---

**1.** The Court has noted that BMWE uses the alternative spelling of "employees" that appears above. The Court, therefore, purposefully adopts this spelling in this opinion even though both this and other courts have not uniformly done so in prior opinions.

F.2d 1228, 1229–30 (1st Cir.1986), and need not be detailed at length again here except for the following portion relevant to the issue currently before the Court.

After exhausting the major dispute procedures available under the Railway Labor Act, and in response to the abolishment of additional maintenance of way positions, BMWE exercised self-help and initiated a strike against the Railroad in March, 1986. BMWE extended its self-help action, in the form of secondary picketing, first to additional carriers owned by the Railroad's parent corporation, Guilford Transportation Industries, Inc., and later to selected carriers outside the Guilford system. On May 16, 1986, President Reagan halted the strike and created Emergency Board No. 209 under Section 10 of the Railway Labor Act, 45 U.S.C. § 160. Executive Order No. 12557, 51 Fed.Reg. 18429 (May 20, 1986). The President's Order also required the parties to maintain the pre-March 3, 1986 status quo until 12:01 a.m. on July 21, 1986.

While the prestrike status quo was being maintained, Emergency Board No. 209 undertook to fulfill the Presidential mandate. Formal hearings began on May 28 and concluded on June 10. The Board submitted its Report and Recommendations to the President on June 20, 1986. In that Report, the Board noted that "[t]he parties were given full opportunity to present oral testimony, documentary evidence and argument in support of their respective positions, including rebuttal ... and post-hearing statements.... Both parties were represented by Counsel." Report to the President by Emergency Board No. 209, June 20, 1986, at 3. The Emergency Board concluded that the Railroad "had substantial need to embark upon a major change in the manner in which it would maintain its right-of-way.... [and] that the magnitude of such change adversely affected an inordinate number of maintenance of way employees." *Id.* at 15. The Emergency Board concluded that the Railroad's circumstances were quite unique. The sale of the Railroad to Guilford Transportation Industries in 1981 had resulted in rapid technological and organizational changes. Although the Railroad had extended job protections to other classes of workers, BMWE members were not included. In addition, the vast majority of BMWE workers lacked protected status under other industry-wide agreements which already bound other carriers who had not taken until the 1980's to mechanize their work forces. *Id.* at 15–17. Based on these unique circumstances, the Emergency Board recommended that the dispute be resolved as follows:

1. The Carrier's proposal dated March 2, 1986 for job protection for then currently active employees, as subsequently modified and presented to the Organization on March 3, 1986, should be adopted; the protective allowance to be $26,000.

2. The parties should negotiate a comprehensive agreement for System Production Maintenance Crews to be used throughout the entire geographical confines of the Maine Central Railroad and the Portland Terminal Company similar to those agreements negotiated on the Boston & Maine and the Delaware & Hudson rail lines of the Guilford System.

3. Consistent with the parties' proposals of March 2 and 3, 1986, and in view of their past practice, the parties should agree to be bound by the results of the national negotiations involving rates of pay and health and welfare programs.

4. The parties should agree to handle changes in work rules and practices contained in notices which had been served prior to Executive Order 12557 under the orderly and peaceful procedures of the Railway Labor Act, as amended, up to and including mediation, and without resort to self-help.

*Id.* at 22–23.

The hiatus from self-help imposed by the executive order and the acceptance by the Emergency Board of the Railroad's March 2, 1986 proposal[2] failed, however, to bring about a resolution of the dispute. Con-

---

**2.** The only apparent difference between the Emergency Board's Recommendations and the Railroad's proposal is that the Railroad offered protective payments of $20,000 instead of the $26,000 which the Emergency Board ultimately recommended.

gress then enacted Public Law 99–385, 100 Stat. 819 (1986), (the First Act), to extend the status-quo period for an additional sixty days.[3] This enactment also created a Congressional Advisory Board, appointed by the National Mediation Board. The Advisory Board was specifically charged to investigate and report to Congress both the progress of any ongoing negotiations and the financial and other circumstances of the dispute including developments since March 3, 1986. The Advisory Board was also to recommend a proposed solution and was not limited to the issues addressed by Presidential Emergency Board No. 209. The precise manner in which the Advisory Board undertook to perform its duties is not known to the Court. The Advisory Board completed its task and issued its report to Congress on September 8, 1986. H.R.Rep. 99–864, 99th Cong., 2d Sess., at 2 (1986), U.S.Code Cong. & Admin.News 1986, p. 2155. The Advisory Board recommended that, unless the parties ended the dispute by agreement before September 13, Congress enact legislation directing the parties to accept the recommendations of Presidential Emergency Board No. 209 and requiring the parties to submit any unsettled issues to binding arbitration.

Congress took precisely this action when it enacted Public Law 99–431, 100 Stat. 987 (September 30, 1986) (the Second Act). Congress expressly stated the purpose of the legislation: to preserve transportation services essential to the national interest but threatened by the current labor dispute. It noted that emergency measures were essential to this purpose. As authority for its action, Congress specifically relied on its powers and responsibilities under the Commerce Clause of the Constitution. Based on the classic principles governing the exercise of equitable powers, this Court refused to enjoin the enforcement of the Second Act in *Maine Central R.R. v. Brotherhood of Maintenance of Way Employees*, 646 F.Supp. 367 (D.Me.1986).[4] The current motions, however, place the constitutional merits of the Second Act squarely before the Court.

## II. THE ISSUES

The Railroad makes the following five arguments in support of its contention that the Second Act is unconstitutional: one, the Second Act violates the equal protection component of the fifth amendment because Congress had no compelling justification to enact such legislation against a discrete and politically powerless class of one[5] and because less restrictive means were available to Congress than the means chosen; two, the Second Act violates the equal protection component of the fifth amendment because it is irrational, arbitrary, and unduly burdensome; three, the Second Act violates the due process clause of the fifth amendment because it singles out the Railroad for unreasonable burdens imposed on no other railroad; four, the Second Act violates the separation-of-powers doctrine by adjudicating the rights of the parties

---

**3.** This Court previously refused to enjoin the enforcement of the First Act. *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employees*, Civil No. 86–0263–P, slip op. (D.Me. Sept. 10, 1986), *aff'd*, 813 F.2d 484 (1st Cir.1987).

**4.** The parties have completed the arbitration proceedings recommended by the Advisory Board and mandated by the Second Act. The arbitrators issued their award on October 30, 1986; it was filed in this Court on November 3, 1986. The Railroad has filed a petition to impeach this award, *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employees*, Civil No. 86–0366–P, and a motion to stay the effectiveness of the award pending a decision on the merits, which the Court denied. *Id.*, 650 F.Supp. 615 (D.Me.1986).

**5.** The Court notes at the outset that the Second Act imposes burdens on a larger class than a "class of one." Although the Railroad must pay employees greater economic benefits than it did before the Second Act, the implementation of system production maintenance crews also affects the BMWE members' prior employment rights. *Cf. Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employees*, 813 F.2d 484, 488 n. 6 (1st Cir.1987) (noting that First Act affected both Railroad and BMWE). The Court recognizes, however, that the size of any class depends on the means by which the class is defined. Rather than quibble about the actual specificity of the class affected by the Second Act, the Court proceeds on the basis that the Second Act imposes burdens on discrete classes and that the Railroad is the only employer forced to assume the specific economic burdens mandated therein.

and imposing a contract upon them; and five, the Second Act contains an unconstitutional delegation of legislative power to the arbitrator. Defendants [6] counter that the Second Act represents an acceptable exercise of Congress's commerce powers.

The Court begins its analysis by noting that the Railroad has the burden of persuasion to establish that the Second Act is unconstitutional. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The Railroad concedes that it is not challenging Congress's power to regulate the railroad industry or to enact general legislation having the effect of the Second Act. Instead, the gravamen of the Railroad's complaint is that Congress may not do so in the form chosen in the Second Act: it may not regulate only one railroad among all in the industry. The Court, therefore, turns to the specific arguments proffered by the Railroad.

## III. TRADITIONAL ANALYSIS OF ECONOMIC REGULATION

■ The Court's scrutiny of economic legislation is extremely circumscribed. If the activity which is the object of the legislation falls within the regulatory powers granted to Congress under the Commerce Clause, as is conceded here, "the only remaining question for judicial inquiry is whether 'the means chosen by [Congress are] reasonably adapted to the end permitted by the Constitution.'" *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258

(1964)). This inquiry is extremely deferential to congressional judgment. "It is enough that [the Court is] able to perceive a basis upon which the Congress might resolve the conflict as it did." *Katzenbach v. Morgan*, 384 U.S. 641, 653, 86 S.Ct. 1717, 1725, 16 L.Ed.2d 828 (1966) (explaining the scope of judicial inquiry into congressional exercise of its analogous powers under § 5 of the fourteenth amendment.) Similarly, under the equal protection component of the fifth amendment, regulation "'may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" *Id.* at 657, 86 S.Ct. at 1727 (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955)). Thus, the classifications used by Congress in economic regulation require nothing more than mere rationality unless they "affect fundamental rights" or "proceed along suspect lines." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). Classifications that are underinclusive, even to the point of specifying a class of one, are "not fatal to the validity of a law under the equal protection component of the Fifth Amendment." *Nixon v. Administrator of Gen. Serv.*, 433 U.S. 425, 471 n. 33, 97 S.Ct. 2777, 2804 n. 33, 53 L.Ed.2d 867 (1977) (dictum).

■ If application of these familiar standards were all that the Court was called upon to do, it would find the Second Act constitutional. The express purpose of the Second Act is to preserve transportation services essential to the national interest which Congress found were threatened by the imminence of another resort to self-help by BMWE.[7] Preserving these trans-

---

6. Defendant BMWE has submitted two Memoranda with regard to the present motions: one in support of its motion and one in opposition to the Railroad's motion. In addition, BMWE has adopted the legal arguments put forth in the Memorandum submitted by Defendant National Mediation Board. BMWE also relies on Argument I of its Memorandum, dated Oct. 6, 1986, in Opposition to the Railroad's Motion for Interlocutory Injunctive Relief.

7. The Railroad has renewed its argument, offered in its prior motions to block the effects of this and previous congressional actions, that

there was no justification for Congress's action because BMWE had not resorted to self-help despite two separate periods during which there was no statutory prohibition for such action. This Court had previously rejected this argument based on its finding that BMWE, "as it has averred before this Court on many previous occasions, would clearly have called a strike in response to the Railroad's plan to implement its new rules." *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employees*, 646 F.Supp. at 369. The Railroad has offered no additional factual support for its assertions, and the Court,

portation services by ending the dispute between the parties is a permissible alternative within the range of rational alternatives available to Congress. *Wilson v. New*, 243 U.S. 332, 351, 37 S.Ct. 298, 303, 61 L.Ed. 755 (1917) (upholding constitutionality of congressional act that imposed eight-hour day and minimum wage rates between parties engaged in nationwide railroad dispute over wages); *Louisville & Nashville R.R. v. Bass*, 328 F.Supp. 732, 743 (W.D.Ky.1971) (upholding constitutionality of congressional act that imposed a settlement on parties to nationwide railroad dispute); *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, B. & Q.R.R.*, 225 F.Supp. 11, 23 (D.D.C.), *aff'd per curiam*, 331 F.2d 1020 (D.C.Cir.), *cert. denied*, 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964) (upholding constitutionality of congressional act that mandated compulsory arbitration of issues underlying nationwide railroad dispute). Although the Railroad argues vigorously that other, more rational remedies were available to Congress, "[i]t was for Congress, as the branch that made this judgment, to assess and weigh the various conflicting considerations.... It is not for [the Court] to review the congressional resolution of these factors." *Katzenbach*, 384 U.S. at 653, 86 S.Ct. at 1725. Similarly, the Court finds that, under the traditional analysis, the Railroad was a legitimate class of one; at the time of the legislation in question, only its labor dispute had ripened to the point that national transportation services were threatened. That other railroad disputes are now undergoing the same ripening process is irrelevant. Congress may direct its attention to only the most immediate problem confronting it. *Id.* at 657, 86 S.Ct. at 1727. In the ordinary case, the Court's inquiry would end here. The Court is persuaded, however, that this is not the ordinary case.

## IV. HEIGHTENED SCRUTINY UNDER THE EQUAL PROTECTION CLAUSE

The Railroad makes several related arguments urging the Court to eschew the traditional equal protection analysis. It begins by distinguishing the line of cases that begins with *Wilson v. New, supra*, on the ground that none of these cases involves legislation directed at one individual railroad. The Railroad then offers two separate grounds upon which the Court might justify closer scrutiny of the congressional decision-making process.

First, the Railroad argues that the Supreme Court has traditionally applied heightened scrutiny to cases involving classes of one, citing *McFarland v. American Sugar Refining Co.*, 241 U.S. 79, 36 S.Ct. 498, 60 L.Ed. 899 (1916); *Cotting v. Kansas City Stock Yards Co.*, 183 U.S. 79, 22 S.Ct. 30, 46 L.Ed. 92 (1901); *Atchison, T. & S.F.R.R. v. Matthews*, 174 U.S. 96, 104, 19 S.Ct. 609, 612, 43 L.Ed. 909 (1899) (dicta). These cases, however, represent nothing more than applications of the traditional "reasonable relationship" test during a period of history in which federal courts scrutinized more closely economic legislation enacted by the several states than would be the case today. That reasonable minds may have reached different conclusions regarding the rationality of state legislation in a different era should not control the Court's reasoning today in reviewing congressional acts arising under the Commerce Clause. Moreover, the Sixth Circuit's reliance on *McFarland* in *Southland Mall, Inc. v. Garner*, 455 F.2d 887 (6th Cir.1972), does not offer the support that the Railroad would attribute to it. In that case, the court merely explained how a taxpayer might establish an equal protection violation by showing either a systematic pattern of discrimination or direct evidence of improper intention. *Id.* at 889. The court went on to hold, however, that the taxpayer had failed to show a discriminatory application of the property tax laws because there was a plausible explanation for the difference in treatment based on the uniqueness of the taxpayer's property. *Id.* at 892. The Railroad, however, has

therefore, has no basis upon which to question Congress's explicitly stated purpose and ratio-

nale.

failed to appreciate the uniqueness of its own circumstances when Congress acted. The First Circuit, just a few weeks ago, highlighted this critical weakness in the Railroad's argument in the Circuit's decision rejecting the Railroad's similar challenge to the First Act. *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employees*, 813 F.2d 484, 489 n. 7 (1st Cir.1987), *aff'g* No. 86–0263–P, slip op. (D.Me. Sept. 10, 1986). It is the unique circumstances surrounding the necessity of preventing a nationwide railroad strike that offers this Court the necessary plausible explanation for Congress's legislation directed solely at this Railroad. The Court refuses to adopt a rational basis test that departs from the mainstream of contemporary analysis.

The Railroad bases its second argument on Justice Stone's famous fourth footnote in *United States v. Carolene Products Co.*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), which reads:

There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments, which are deemed equally specific when held to be embraced within the Fourteenth....

It is unnecessary to consider now whether legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation. [*E.g.,*] restrictions upon the right to vote, ... restraints upon the dissemination of information, ... interferences with political organizations, ... prohibition of peaceable assembly....

Nor need we enquire whether similar considerations enter into the review of statutes directed at particular religious, ... or national ... or racial minorities ...: whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes

ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.

*Id.* at 152–53 n. 4, 58 S.Ct. at 783–84 n. 4 (citations omitted). The Railroad argues that a class of one exemplifies the above-mentioned ability of the majority to tyrannize minority groups because a minority group of one cannot protect itself in the democratic political process. In the Railroad's eyes, it is David, a "small Maine railroad," facing Goliath, "a powerful and influential national labor organization." Plaintiffs' Memorandum of Law, at 24.

The Railroad has, in effect, collapsed the second and third paragraphs of Justice Stone's footnote into one test: courts must closely scrutinize legislation that exclusively affects a class that lacks the political power to repeal the undesirable legislation. The Court does not understand Justice Stone's concerns to have been so broad. Instead, these paragraphs identify two distinct problem areas. The first need not concern the Court in this case for it addresses restrictions on the political process itself. The second, however, cautions the Court to scrutinize carefully legislation that affects "discrete and insular minorities." The Railroad contends that it is such a politically powerless minority.

The Railroad's argument ignores, however, one important component of Justice Stone's test: he was concerned with *prejudice* against such minorities and not merely with minorities *per se.* As Professor Ely has so aptly demonstrated:

In a sense the complainant in every case speaks for such a [discrete and insular minority]: he wouldn't be in court if the class in which the legislature had placed him had not been, on at least one occasion, a political minority (they lost), both discrete (they're the ones on the disfavored side of the statutory line) and insular (they couldn't gather enough allies to defeat the legislation). But obviously that isn't what Justice Stone meant. His reference was rather to the sort of "pluralist" wheeling and dealing by which the various minorities that make up our

society typically interact to protect their interests, and constituted an attempt to denote those minorities for which such a system of "mutual defense pacts" will prove recurrently unavailing.

. . . .

An added element is therefore needed, that the minority in question be one that is barred from the pluralist's bazaar, and thus keeps finding itself on the wrong end of the legislature's classifications, for reasons that in some sense are discreditable. Standard renditions of what we think of as the *Carolene Products* approach . . . do not include this element: "discrete and insular minorities" are simply entitled to "heightened judicial solicitude." Justice Stone's original, however, was richer than this, indicating that *"prejudice against discrete and insular minorities* may be a special condition, which tends to curtail the operation of those political processes ordinarily to be relied upon to protect minorities...." "[P]rejudice, in short, provides the 'majority of the whole' with that 'common motive to invade the rights of other citizens' that Madison believed improbable in a pluralistic society."

J. Ely, *Democracy and Distrust* 151–53 (1980) (emphasis in original). *Accord Nixon v. Administrator of Gen. Serv.,* 433 U.S. at 470–71, 97 S.Ct. at 2804–05 (rejecting similar overly broad argument under Bill of Attainder Clause).

■ The Court has no basis on which it might find that the Railroad is a discrete and insular minority incapable of influencing the political processes. In fact, just the opposite appears to be true. The Railroad is but one member of the larger class of all railroads, traditionally considered to be among the most powerful of economic enterprises, a class whose own future contract negotiations must proceed under the coercive force of possible congressional intervention and imposition of similar economic burdens. The opportunity for coalition-building seems favorable, not unfavorable. The Railroad has not demonstrated, and indeed the Court believes it could not demonstrate, any basis upon which the Court might conclude that it has been the object of widespread prejudice as have been the groups traditionally recognized as suspect classes: racial and national minorities, women, aliens, and illegitimates. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2394 n. 14, 72 L.Ed.2d 786 (1982). Consequently, the Court must conclude that the Second Act does not include a suspect classification which would justify the Court's closer scrutiny of its rationale and result.

It is clear to the Court that the Railroad has devoted substantial energy to this line of argument in order to avoid the minimum rationality standards analyzed in Part III, *supra.* In doing so, the Railroad seeks to persuade the Court that a different view of equal protection must prevail in cases involving a class of one. It urges the Court to accept Justice Jackson's view of the proper limits of the equal protection clause:

> The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.

*Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 112–13, 69 S.Ct. 463, 466–67, 93 L.Ed. 533 (1949) (Jackson, J., concurring).

Unfortunately, Justice Jackson's view of the equal protection clause has never received modern acceptance. This Court likewise refuses to resurrect it. *Accord Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employees,* 813 F.2d 484, 491 (1st Cir.1987) (confining review of economic regulation under the equal protection clause to "the rational basis test").

Nevertheless, a failure under this line of analysis does not preclude further review of this legislation. The Court finds that there is indeed a certain anomaly inherent in legislation that imposes burdens on a class of one. In the Court's view, this anomaly touches upon the fundamental principles underlying our representative form of government. Although Justice Jackson saw the equal protection clause as the best protection against "arbitrary and unreasonable government," this Court sees other provisions of the Constitution as offering similar protections. The Court, therefore, turns to the Railroad's arguments based on these other provisions, beginning with the separation-of-powers doctrine.

## V. SEPARATION OF POWERS

"The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar,* —— U.S. ——, ——, 106 S.Ct. 3181, 3191, 92 L.Ed.2d 583 (1986). The historical development of what has come to be known as the separation-of-powers doctrine has been detailed elsewhere and need not be reiterated here. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 120–31, 96 S.Ct. 612, 682–88, 46 L.Ed.2d 659 (1976); Levi, *Some Aspects of Separation of Powers,* 76 Colum.L.Rev. 371 (1976). The Supreme Court has expressly adopted "the more pragmatic, flexible approach of Madison in the Federalist Papers" to the doctrine. *Nixon,* 433 U.S. at 442, 97 S.Ct. at 2789–90; *see generally* J. Madison, *The Federalist Nos. 47 & 51* (J. Cooke ed. 1961). Thus, the boundaries between Congress and the other branches are not precisely defined nor is a total separation of the three branches thought to be contemplated by the Constitution. *Buckley v. Valeo,* 424 U.S. at 121, 96 S.Ct. at 683; *Springer v. Philippine Islands,* 277 U.S. 189, 209–10, 48 S.Ct. 480, 484–85, 72

L.Ed. 845 (1928) (Holmes, J., dissenting). Nevertheless, "the influence of Montesquieu's thesis that checks and balances were the foundation of a structure of government that would protect liberty" remains. *Bowsher,* —— U.S. at ——, 106 S.Ct. at 3186.

The Railroad argues that the congressional imposition of a labor contract on a single business is an unwonted denial of these basic protections. It relies on Chief Justice Marshall's familiar maxim that Congress should prescribe rules of general applicability; individualized application of these rules should be left to other branches or departments. *See Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 136, 3 L.Ed. 162 (1810); *see generally* L. Tribe, *American Constitutional Law* § 10–1 (1978). Under the Madisonian approach to separation of powers and the facts of this case, the Court would restate Chief Justice Marshall's premise. It appears to the Court that the general rule is that Congress prescribes rules of general application; an exception arises when Congress prescribes a rule applicable to only one individual. Thus, the Court perceives the issues as: first, whether the exception itself is a violation of the separation-of-powers doctrine and second, if the exception does not violate this doctrine, whether any additional safeguards are required by the Constitution.

The Supreme Court has addressed the first issue in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), and *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). In neither case did the Supreme Court find that legislation applicable to only one individual was a *per se* violation of the separation-of-powers doctrine. Of these two, *Chadha* appears to bear great similarity to the present case as it also contained an allegation that Congress had impermissibly usurped judicial, as opposed to executive,[8] power.

---

**8.** A large number of separation-of-powers cases have involved conflicts between the legislative and executive branches. *See, e.g., Bowsher v. Synar,* —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Youngstown Sheet*

*& Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); *Springer v. Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928); *Myers v. United States,* 272 U.S. 52, 47

■ In *Chadha*, the Supreme Court described three ways in which a court might identify the separate powers delegated to the three branches. One, these powers are "functionally identifiable." 462 U.S. at 951, 103 S.Ct. at 2784. Two, congressional actions are an exercise of legislative power if they are legislative in purpose and effect. *Id.* at 952, 103 S.Ct. at 2784–85. Finally, congressional acts cannot be judicial acts if the subject matter of the act does not encompass a justiciable case or controversy within the meaning of Article III. *Id.* at 957 n. 22, 103 S.Ct. at 2787 n. 22.

This Court can draw no firm guidance from *Chadha's* "functionally identifiable" language. As Justice Brandeis noted over a half century ago, each branch of government has the "power to exercise, in some respects, functions in their nature executive, legislative and judicial." *Myers v. United States*, 272 U.S. 52, 291, 47 S.Ct. 21, 84, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting). And as the Supreme Court noted just recently, a particular function will take on the aspects of the branch to which it is assigned; thus, the power exercised by Congress may have a "chameleon-like quality." *Bowsher,* —— U.S. at ——, 106 S.Ct. at 3201 (Stevens, J., concurring).

Turning, however, to the "purpose and effect language," the Court finds that the Second Act has "the purpose and effect of altering the legal rights, duties, and relations of persons ... all outside the Legislative Branch." *Chadha*, 462 U.S. at 952, 103 S.Ct. at 2784. This purpose and effect is legislative. *Id.; see also Springer v. Philippine Islands*, 277 U.S. 189, 210, 48 S.Ct. 480, 485, 72 L.Ed. 845 (Holmes, J., dissenting) ("To make a rule of conduct

applicable to an *individual* who but for such action would be free from it is to legislate...." ) (emphasis added). *See also Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employees*, 813 F.2d 484, 492 (1st Cir.1987).

Finally, although the Railroad argues that Congress improperly adjudicated the rights of the parties, it is clear to the Court that no justiciable case or controversy existed between the Railroad and the BMWE once the parties could again resort to self-help. When Congress enacted the Railway Labor Act, it set up a system that resolved railroad labor disputes through arbitration, mediation, and conciliation. Once, however, the parties had exhausted the procedures mandated by the Act, they were free to resort to self-help subject to only the influence of public opinion arising from the recommendations of the emergency board created by the President. *See generally* H. Lustgarten, *Principles of Railroad & Airline Labor Law* 1–13 (1984). At that time, however, neither party had any rights under the Act that this Court could enforce. Nor does this Court have the power to fashion its own resolution of the dispute. As there was no remedy available under the Act, the only path to settlement, absent a voluntary agreement of the parties, was indirect enforcement of the *goals* of the Act through the enactment of new legislation by Congress. *See Bowsher,* —— U.S. at ——, 106 S.Ct. at 3192; *Chadha*, 462 U.S. at 958, 103 S.Ct. at 2787–88. Congress did precisely this when it enacted the Second Act. That it chose to impose a settlement on the parties to the dispute instead of prohibiting secondary picketing[9], as the Railroad would have pre-

---

S.Ct. 21, 71 L.Ed. 160 (1926). Although the Court, on its own initiative, has considered these cases, it focuses its analysis more closely on cases in which the alleged conflict has involved the judicial branch. *See, e.g., Chadha, supra; United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980); *Watkins v. United States,* 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); *In re Debs,* 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895); *Kilbourn v. Thompson,* 103 U.S. (13 Otto) 168, 26 L.Ed. 377 (1880); *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871); *Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 18 L.Ed. 281

(1866). The Court has also reviewed those cases based on the prohibition against bills of attainder. *See, e.g., Nixon, supra; United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); *United States v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). As this last ground has not been raised by the parties, the Court does not address it further.

9. Recently, five Circuit Courts of Appeals have found that the Railway Labor Act does not prohibit secondary picketing. *See Brotherhood of Maintenance of Way Employees v. Guilford Transp. Indus.,* 803 F.2d 1228 (1st Cir.1986);

ferred, does not transform the congressional act from a legislative to a judicial one.

■ Having considered all three tests articulated by the *Chadha* majority, the Court finds that the Second Act is clearly legislative in purpose and effect and does not encroach upon the judicial powers reserved to the courts by Article Three. Consequently, the Court finds that the Second Act does not violate the separation-of-powers doctrine. In light of this finding, the Court now reaches the second issue, an issue the Supreme Court did not reach in *Chadha* and the First Circuit did not reach in its review of the First Act: whether additional safeguards are required when legislation singles out one individual for special burdens.[10] *Cf. Chadha*, 462 U.S. at 954 n. 17, 103 S.Ct. at 2785 n. 17; *Maine Cent. R.R.*, 813 F.2d at 492–93 (finding that the First Act did not realign the parties' rights but merely extended the statutory scheme then in effect).

The Court begins its inquiry by noting the one theme which consistently recurs in those cases that consider the constitutionality of legislation aimed at a class of one: a persistent fear that such legislation might expose the individual to "the tyranny of a shifting majority." *Id.* 462 U.S. at 966, 103 S.Ct. at 2792 (Powell, J., concurring); *accord Nixon*, 433 U.S. at 485–86, 97 S.Ct. at 2813–14 (Stevens, J., concurring); *McFarland*, 241 U.S. at 86, 36 S.Ct. at 501; *Cotting*, 183 U.S. at 105–12, 22 S.Ct. at 41–44; *Atchison*, 174 U.S. at 104–05, 19 S.Ct. at 612–13; *Maine Cent. R.R.*, 813 F.2d at 492–93. *See generally* Sunstein, *Naked Preferences and the Constitution*, 84 Colum.L.Rev. 1689 (1984). Justice Powell would ground this concern in the separation-of-powers doctrine itself: such legisla-

tion "raises the dangers the Framers sought to avoid." *Chadha*, 462 U.S. at 964 n. 7, 103 S.Ct. at 2791 n. 7 (Powell, J., concurring).

The critical danger, however, is not necessarily that Congress will perform a function not within its sphere. Instead, it is that if Congress performs such a function, it will do so without the checks that inure to the more traditional performance of that function. Justice Powell's concurrence in *Chadha* expressly recognizes this aspect of the danger: "Congress is not bound by established substantive rules. Nor is it subject to the procedural safeguards ... that are present when a court or an agency adjudicates rights." *Id.* at 966, 103 S.Ct. at 2792 (footnote omitted). Similarly, the Court in *Nixon* considered the procedural due process aspects of the Act it was reviewing as one factor supporting its constitutionality: the Act afforded President Nixon "all of the protections that inhere in a judicial proceeding" before the confiscation of his property would become permanent. 433 U.S. at 481–82, 97 S.Ct. at 2809–10.

■ If this discussion is reminiscent of the equal protection analysis in Part IV, *supra*, it is because the same fundamental values underlie the separation-of-powers doctrine and the equal protection clause as well as the due process clause and various other constitutional constraints. All of these are but alternative methods of ensuring that government remains accountable for its actions: they prevent, at the very least, arbitrary governmental action. Sunstein, *supra*, 84 Colum.L.Rev. at 1689–93.

---

*Norfolk & Western Ry. v. Brotherhood of Maintenance of Way Employees*, 795 F.2d 1169 (4th Cir.1986), *petition for cert. filed*, 55 U.S.L.W. 3115 (U.S. Aug. 19, 1986) (No. 86–175); *Richmond, F. & P.R.R. v. Brotherhood of Maintenance of Way Employees*, 795 F.2d 1161 (4th Cir.1986), *petition for cert. filed*, 55 U.S.L.W. 3259 (U.S. Oct. 14, 1986) (No. 86–503); *Central Vermont Ry. v. Brotherhood of Maintenance of Way Employees*, 793 F.2d 1298 (D.C.Cir.1986); *Burlington N.R.R. v. Brotherhood of Maintenance of Way Employees*, 793 F.2d 795 (7th Cir.1986), *cert. dismissed*, —— U.S. ——, 106 S.Ct.

2911, 91 L.Ed.2d 541 (1986); *Consolidated Rail Corp. v. Brotherhood of Maintenance of Way Employees*, 792 F.2d 303 (2d Cir.1986), *petition for cert. filed*, 55 U.S.L.W. 3175 (U.S. Sept. 23, 1986) (No. 86–353).

**10.** The Supreme Court did reach this question in *Nixon, supra,* but found no independent constitutional violation in that case. Differences between *Nixon* and the present case, however, preclude close comparison of the two or reliance on that Court's ultimate conclusion.

Most of the Railroad's arguments focus on what it perceives to be the actual arbitrariness of the Second Act. In fact, these arguments are grounded in concerns most commonly labeled "due process" considerations. For instance, the Railroad raises such traditional procedural due process concerns as surprise, lack of notice, and lack of an opportunity to be heard. In addition, the Railroad pursues a substantive due process claim: it contends that the only rational choice available to Congress was to prohibit secondary picketing. Although the Railroad freely intermingles the two arguments, the prudent approach is to maintain the distinction between them. The Court is well aware that the "translation of substantive claims into procedural ones is an obviously attractive device for inducing review." Mashaw, *Constitutional Deregulation: Notes Toward a Public, Public Law,* 54 Tulane L.Rev. 849, 862 (1980). The Court has, however, reviewed the Second Act on substantive due process grounds and has found the congressional choice to be rational. *See supra* Part III. The Court will not reopen this line of inquiry simply because it has been recast as a procedural challenge. *See New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 439 U.S. 96, 104–08, 99 S.Ct. 403, 409–11, 58 L.Ed.2d 361 (1978) (refusing to accept plaintiff's characterization of its claim as a procedural due process challenge).

■ Nevertheless, the Court finds that the Railroad's procedural due process arguments strike at the heart of the matter: as government focuses its attention on specific individuals and imposes burdens on them, it must necessarily afford those individuals some opportunity to participate in a meaningful manner. *See generally* L. Tribe, *supra,* at 477, 501; *accord* Levi, *supra,* 76 Colum.L.Rev. at 385. This is not to say that the Court adopts a "due process in lawmaking" theory. *See Fullilove v. Klutznick,* 448 U.S. 448, 549 & n. 24, 100 S.Ct. 2758, 2811 & n. 24, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting); *Delaware Tribal Business Comm. v. Weeks,* 430 U.S. 73, 98 & n. 11, 97 S.Ct. 911, 925–26 & n. 11, 51 L.Ed.2d 173 (1977) (Stevens, J., dissenting) (both citing other authorities). Nor

does the Court wish to prescribe the procedural format that should be followed. *Cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 542–43, 98 S.Ct. 1197, 1210–11, 55 L.Ed.2d 460 (1978) (limiting the courts' review of agency procedures to "quasi-judicial" determinations affecting persons on an individual basis) (dicta). Instead, the Court finds that, in reviewing the extremely exceptional circumstance of congressional economic regulation that imposes burdens solely on one entity within an entire industry, the Court is obligated under the Constitution to evaluate whether Congress has provided the necessary safeguards to prevent the *unchecked* exercise of raw political power. *Cf.* Ginnane, *The Control of Federal Administration by Congressional Resolutions and Committees,* 66 Harv.L.Rev. 569, 593 (1953) (discussing the role of checks on undue concentration of power between the executive and legislative branches). Furthermore, the Court finds that this evaluation is best made in terms of procedural due process. *See* Kadish, *Methodology and Criteria in Due Process Adjudication—A Survey and Criticism,* 66 Yale L.J. 319, 358 (1957) ("[T]he common objections to an enlarged judicial review lose much of their persuasiveness, however, where the challenge is not to remake substantive policy, but to supervise the procedures through which laws are enforced upon individuals.") (footnote omitted). The Court, therefore, turns to a consideration of the due process safeguards attendant to the Second Act.

## VI. PROCEDURAL DUE PROCESS

The Railroad presents the following procedural due process arguments. One, it contends it had no opportunity to present its side of the dispute to Congress. Two, Congress acted without hearing, debates, recorded vote, a printed copy of the Act, or a published copy of the House Report. Three, it had no notice that the proceedings before Emergency Board No. 209 would be made retroactively binding. Finally, it had no notice that protection payments would be retroactively required when it fur-

loughed employees no longer needed due to business losses from the previous BMWE strike. All of these defects, in the Railroad's view, have culminated in the imposition upon it of the most expensive railroad contract in the nation with labor protection provisions that a subsequent Emergency Board found to be unwarranted and anticompetitive on a nationwide basis, Report to the President by Emergency Board No. 211, Aug. 14, 1986, at 37—a contract that the Railroad maintains is merely an arbitrary response to intense lobbying efforts.

The analytical path that the Court must take in evaluating the Railroad's contentions was established in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Eldridge test

> requires the consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903. The Court begins, as did the *Eldridge* Court, *id.*, with a description of the procedures actually used.

The Second Act afforded the Railroad some procedural safeguards at three distinct junctures: one, in the proceedings before Emergency Board No. 209; two, in the proceedings before the congressional advisory board and special committee; and three, during the arbitration proceedings mandated by the Act to resolve the issues surrounding its implementation. The Court focuses its attention first on the proceedings before the Emergency Board.[11]

The record indicates that formal hearings were held during which the Railroad, represented by counsel, was "given full opportunity to present oral testimony, documentary evidence and argument in support of [its position]." Report to the President by Emergency Board No. 209, June 20, 1986, at 3. These, of course, are the traditional safeguards of the adversarial system. In addition, the proceedings took place before an impartial tribunal appointed by the President. Moreover, the Court's careful review of the Report indicates that the Railroad presented the full scope of its concerns, including its position regarding secondary picketing and its financial and competitive position after the aborted BMWE strike, to the Emergency Board. There appears to be no basis upon which the Railroad could contend that the proceedings lacked the necessary procedural safeguards.

The record is less clear regarding the proceedings before the congressional advisory board. The Railroad's exhibits reveal, however, that it presented its policy arguments both to this board and to the House Subcommittee on Commerce, Transportation and Tourism. The Railroad does not argue that it was not allowed full opportunity to submit its views to either body.

■ Ordinarily, the Constitution does not require Congress to use facts to support its legislative choices.[12] Pilchen, *Politics v. The Cloister: Deciding When The Su-*

11. The Court finds no reason at this time to address the adequacy of the due process safeguards required in the subsequent arbitration. First, the Court will review that proceeding, including several due process challenges, in a separate action, *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employes,* Civil No. 86–0366–P. Second, the Railroad's central argument in the present action is clearly focused on the substantive policy choice made by Congress and the Railroad's alleged lack of an adequate opportunity to affect that choice. With this focus, the post-deprivation procedures lose much of their significance. The Court does not

imply, however, that under different circumstances or in light of a different challenge, post-deprivation procedures might not be central. *Cf. Nixon,* 433 U.S. at 481–82, 97 S.Ct. at 2809–10.

12. There is also no constitutional requirement that Congress hold hearings, debate, or a recorded vote in order to pass legislation. *See* U.S. Const. Art. I, §§ 1, 5, 7. *Cf. Chadha,* 462 U.S. at 926–27, 103 S.Ct. at 2771–72 (unprinted and uncirculated resolution passed without debate or recorded vote.)

*preme Court Should Defer to Congressional Factfinding Under the Post-Civil War Amendments*, 59 Notre Dame L.Rev. 337, 363 n. 168 (1984); Davis, *Facts in Lawmaking*, 80 Colum.L.Rev. 931, 932 (1980). This Court determines, however, that this case, involving as it does burdens imposed on a class of one, represents the exception to that general rule. The Railroad's protection from Congress's use of raw political power lies precisely in there being a nexus between the facts of the dispute, as developed with the Railroad's participation, and the ultimate congressional action.

The Court, moreover, is persuaded that the necessary nexus exists. The opportunity to develop the factual record existed before the Emergency Board where the Railroad received full procedural protections. The Emergency Board issued a Report in which it set forth these facts in detail and stated the relation between the facts and its recommendations. Congress accepted [13] the Emergency Board's recommendations and enacted them without change. Thus, it is clear to the Court that Congress responded to the factual dispute, as analyzed by the Emergency Board, and acted in accordance with those independent recommendations generated by the factual record. In this light, the Railroad's charge that the Second Act is merely a congres-

sional response to superior political pressure loses its persuasive force.

■ Turning now to the test articulated in *Eldridge*, the Court begins by noting that the railroad industry has long been one of the most heavily regulated industries in our nation. The Railroad's membership in such a public business necessarily subjects its interests to congressional regulation, with the limitation that its property cannot be destroyed through confiscation. *Wilson v. New*, 243 U.S. at 349, 37 S.Ct. at 302. Because the Railroad clearly does not have an unfettered interest in its business activities, at least until Congress decides to change the regulatory policies of the Railway Labor Act, it is difficult for the Court to be persuaded that additional procedural safeguards would in this case reduce the risk of an erroneous result. There seems to be little point in requiring the parties to undertake the expense and burdens of repeating the process already completed before the Emergency Board. Due process has never meant that adversaries are entitled to successive forums in the hopes of changing the factual determinations made in the first instance. Consequently, the Court finds that the procedural safeguards attendant to the Second Act were adequate.

Recognizing perhaps that it was afforded a full panoply of procedural due process protections [14] before the Emergency Board,

---

**13.** The Court offers no opinion regarding the additional safeguards that might be necessary if Congress did not accept the recommendations of the Emergency Board. *Cf. Chadha, supra.*

**14.** The Railroad also contends that it had no notice that the proceedings before the Emergency Board would be made retroactively binding. The Court finds that this contention is without merit. First, the Railroad had actual notice regarding the nature and scope of the proceedings before the Emergency Board. The Railroad was also aware of the temporal significance of the Emergency Board's recommendations. Although it is true that those recommendations were not at the time binding, they did represent the final opportunity for impartial evaluation of the dispute under the Railway Labor Act. Moreover, the Chairman of the Railroad's parent company explicitly acknowledged that once a strike threatens "the actual interruption of the flow of commerce, Congress has traditionally intervened." *Hearing on H.R.J. 683, Subcomm. on Commerce, Transp. & Tour-*

*ism of the House Comm. on Energy & Commerce*, 99th Cong., 2d Sess. (1986) (Statement of Timothy Mellon, Chairman, Guilford Transportation Industries, at 5). In at least one other instance, this congressional intervention has been through the imposition of the recommendations of a Presidential Emergency Board. Pub.L. 97–262, 96 Stat. 1130 (1982). Thus, the Railroad clearly had constructive, if not actual, notice that the recommendations of Emergency Board No. 209 could become binding unless the parties reached an independent agreement. Furthermore, the Railroad does not argue that it lacked the incentive to present its claims to the Emergency Board. Indeed, the Report itself reveals that the Railroad pressed all of its factual and policy positions. Finally, the recommendations of the Emergency Board were not given *res judicata* or collateral estoppel effect. Instead, Congress evaluated these recommendations and considered the input of both the Railroad and BMWE. Under these circumstances, the Court perceives no prejudice to the Rail-

the Railroad argues, in effect, that these protections were afforded before the wrong forum—the correct forum allegedly being Congress itself. At the same time, however, the Railroad argues that it "cannot possibly make its voice heard in the national political arena." Plaintiffs' Memorandum of Law, at 38. The Railroad presents this conundrum to illustrate what it sees as the fundamental problem inherent in the Second Act.

The Court need not become entangled in extended analysis of this conundrum in order to point out its basic flaw. The conundrum merely illustrates the futility of attempting to use procedural due process arguments to effect heightened substantive due process review. The Railroad's concerns with due process do not center on its opportunity to be heard with regard to any adjudicable factual dispute. The scope of the process afforded the Railroad before the Emergency Board and the detailed Report of that Board compel the conclusion that the facts surrounding the dispute have been fully developed. Instead, the Railroad's concerns center on its ability to affect the ultimate policy choice between a decision to allow the Railroad to go forward with its plans, albeit with increased labor costs to the Railroad, and a decision to restrict the coercive power of BMWE to primary picketing which would in effect allow the Railroad to reorganize its workforce without incurring additional labor costs. This policy choice is, however, not reviewable unless it is not supported by a factual record. The Railroad had a full opportunity to develop an evidentiary record of contrary thrust. The focus,

therefore, of the Court's inquiry is merely whether the Railroad had an opportunity to be heard in a setting in which its evidence could be received and evaluated impartially and whether this record formed the basis for Congress's subsequent action. Thus, there is a conundrum only if the Court allows itself to be led to the substantive conclusion via the procedural path. The Court, however, is convinced that the substantive result cannot be reached unless Congress ignored the factual record. Congress clearly did not do so in this case. Therefore, the Court holds that the Second Act does not raise the dangers the Framers sought to avoid; although the Second Act imposes burdens on only one entity in an entire industry, those burdens are based on a factual record in the development of which that entity had a full opportunity for meaningful participation.

## VII. DELEGATION

The Railroad bases its final challenge to the Second Act on what it perceives to be the complete absence of standards by which the arbitrator was to determine the "unresolved implementing issues" involved in transforming the recommendations of Emergency Board No. 209 into a contract between the parties. The Railroad puts forth two arguments in support of this challenge.

First, the Railroad compares the Second Act with Public Law 88–108, 77 Stat. 132 (1963), which was upheld in *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, B. & Q.R.R.*, 225 F.Supp. 11 (D.D. C.), *aff'd per curiam*, 331 F.2d 1020 (D.C. Cir.), *cert. denied*, 377 U.S. 918, 84 S.Ct.

road's opportunity to be heard by Congress's later acceptance of the Emergency Board's recommendations.

Equally unpersuasive is the Railroad's contention that it had no notice that protection payments would be retroactively required when it furloughed those employees no longer needed due to the business losses caused by the strike. Clearly, the issue of protective payments was central to the dispute then underway. The imposition of a solution limited to the current dispute can hardly be called retroactive. Even if these economic burdens are so characterized, they are permissible under the due process clause where the action affected is among those

actions that motivated the legislation. *See* Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv.L. Rev. 692, 701–02 (1960). This is particularly true where Congress imposes retroactive economic burdens that are justified by a rational legislative purpose. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730–31, 104 S.Ct. 2709, 2718–19, 81 L.Ed.2d 601 (1984). *Cf. Usery v. Turner Elkhorn Mining Co.,* 428 U.S. at 17 & n. 16, 96 S.Ct. at 2893 & n. 16 (employers' knowledge of possible liabilities and their reliance on current law are factors to be considered in evaluating retrospective economic burdens).

1181, 12 L.Ed.2d 187 (1964). The Railroad concludes that the differences between the two acts compel a finding that the Second Act lacks adequate standards. The Court disagrees. The Act upheld by the District of Columbia court did not impose the recommendations of an emergency board upon the parties to that dispute. Instead, it ordered the creation of an arbitration board to pass on two as yet unresolved major issues between the parties. 225 F.Supp. at 15. Thus, in that case, Congress delegated its legislative power to create a solution to the dispute. *Id.* at 22. The standards that the court found adequate in that case do not necessarily set the minimum standards that should be controlling here.

Even if the Court were to rely on those standards, it does not find significant differences. Both acts set a standard with respect to the maintenance of public transportation. The 1963 Act also included standards relating to the interests of both the carrier and the employees and to the prior progress made through bargaining and mediation. *Id.* at 23. These standards were, of course, germane to the actual dispute.

 Similarly, the Second Act specifically refers to the report and recommendations of Emergency Board No. 209 as defining the basis for the unresolved implementing issues that were to be arbitrated in the present dispute. This reference sufficiently defines the scope of the arbitration. In addition, the recommendations themselves provide the following standards: one, job protection payments should be provided for employees who were "currently active" as of March 3, 1986; two, the parties should agree to system seniority for production work "similar to those agreements negotiated on the Boston & Maine and the Delaware & Hudson rail lines of the Guilford System" with a per diem allowance "not less than that which is currently paid to maintenance of way employees" in the Guilford system; three, changes in rates of pay and health and welfare programs

should be governed by the results of national negotiations; four, changes in local rules and working conditions should be addressed under the Railway Labor Act "up to but not including mandatory arbitration or resort to self-help." Moreover, the Second Act provides that section 7 of the Railway Labor Act should control the actual arbitration. By bringing the arbitration within the Railway Labor Act, Congress clearly provided adequate standards for the conduct of the arbitration. Finally, because binding arbitration is an explicit, albeit usually voluntary, provision of the Railway Labor Act, 45 U.S.C. § 157, the standards for the present mandatory arbitration may be derived from the Railway Labor Act itself. When these standards are combined with the factual background of the current dispute and the recommendations of Emergency Board No. 209, both of which arose from the Railway Labor Act, the Court finds that Congress has provided sufficient standards for this arbitration.[15]

In its second argument, the Railroad asks the Court to adopt the reasoning of the Southern District of New York, which recently implied that standardless delegation of power to arbitrators would violate the nondelegation doctrine. *See Union Carbide Agric. Prod. v. Ruckleshaus,* 571 F.Supp. 117, 124 (S.D.N.Y.1983) (*dicta*), *rev'd on other grounds sub nom. Thomas v. Union Carbide Agric. Prod.,* 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). *Contra PPG Indus. v. Stauffer Chem. Co.,* 637 F.Supp. 85, 89 (D.D.C.1986). The Court, however, does not reach this argument as it has found that the Second act is far from standardless. The Court notes, however, that the Supreme Court in *Union Carbide,* in remanding the delegation issue, specifically explained that even if a particular delegation appears standardless, the court might derive the necessary standard from the purpose, legislative history, or factual background of the act in question. 105 S.Ct. at 3339–40. Consequently, the Court is unpersuaded that the above result

---

**15.** The Railroad also argues that the arbitrator exceeded these "purported" standards, which to the Railroad illustrates the inadequacy of the standards themselves. This argument, however, should be made in the Railroad's challenge to the award itself.

would be different if it were to reach this argument.

## VIII. NATIONAL MEDIATION BOARD

██ Defendant National Mediation Board (the Board) requests dismissal of the Railroad's claims against the Board contending that no justiciable controversy exists between itself and the Railroad. The Court agrees and dismisses the Railroad's complaint against the Board. Fed.R.Civ.P. 12(b)(6).

The Board bases its argument on *Ozark Air Lines v. National Mediation Board,* 797 F.2d 557 (8th Cir.1986), which held that the Board was not a proper party to a dispute where its only role was to appoint an arbitrator. *Id.* at 563. *Accord Radin v. United States,* 699 F.2d 681, 686 (4th Cir.1983) (citing cases that apply similar reasoning in dismissing suits against National Railroad Adjustment Board). The Court finds the reasoning in *Ozark* to be persuasive.

Even if the Court were to reject the justiciability and policy concerns detailed in the *Ozark* opinion, it finds that any possible previous controversy between the Railroad and the Board is now moot. The Court finds that the sole function of the Board under the Second Act was to appoint an arbitrator to resolve the implementing issues. The Board has fulfilled this function, and the arbitrator has completed his task. Consequently, it appears that the Court can no longer grant the Railroad any of the relief it has requested against the Board. Such changed circumstances can render a once viable controversy moot. *See 13 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure,* § 3533.3 (1984).

The Railroad attempts to distinguish *Ozark* and the grounds for that court's decision by arguing that the Board will necessarily be involved in the continuing enforcement of the Second Act: it will be bound by the Second Act and *may* use the Second Act as a basis to refuse a request for mediation services. In essence, the Railroad sees the Board as equivalent to a federal agency or a body of federal officers. It consequently relies on *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 704, 69 S.Ct. 1457, 1468–69, 93 L.Ed. 1628 (1949), to support its argument that the Board is a proper party to this action. The Court finds the Railroad's arguments unpersuasive. Any role that the Board might play in the continued enforcement of the Second Act is speculative at this point and is, therefore, too indefinite to constitute a present controversy between the parties. *Cf. Division 580, Amalgamated Transit Union v. Central New York Regional Transp. Auth.,* 578 F.2d 29, 32–33 (2d Cir.1978) (finding issue moot where continued involvement in controversy was contingent on the parties' continuing inability to agree). Arbitration boards, unlike federal regulatory agencies, lack the ongoing interest in their decisions which otherwise justify the inclusion of such agencies as parties. *Skidmore v. Consolidated Rail Corp.,* 619 F.2d 157, 159 (2d Cir.1979), *cert. denied,* 449 U.S. 854, 101 S.Ct. 148, 66 L.Ed.2d 488 (1980). *Larson* is, therefore, inapposite.

## IX. CONCLUSION AND ORDER

For the reasons detailed above, the Court finds that the Second Act, Pub.L. 99–431, 100 Stat. 987 (Sept. 30, 1986), is constitutional. The Court, therefore GRANTS Defendant BMWE's Motion for Summary Judgment. In addition, the Court finds no justiciable controversy as to Defendant National Mediation Board and therefore GRANTS Defendant's Motion to Dismiss.

SO ORDERED.